565 F.2d 31
 15 Fair Empl.Prac.Cas. 1618, 15 Empl. Prac.
Dec. P 7894
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, and the City of New
York, Plaintiffs- Appellees,
v.
LOCAL 638 . . . Local 28 of the Sheet Metal Workers'
International Association and Local 28 Joint
Apprenticeship Committee, Defendants-Appellants,
Sheet Metal and Air-Conditioning Contractors' Association of
New York City, Inc., etc., Defendants.
LOCAL 28, Third-Party Plaintiff,
v.
NEW YORK STATE DIVISION OF HUMAN RIGHTS, Third-Party Defendant.
LOCAL 28 JOINT APPRENTICESHIP COMMITTEE, Fourth-Party Plaintiff,
v.
NEW YORK STATE DIVISION OF HUMAN RIGHTS, Fourth-Party Defendant.
 No. 1302, Docket 76-6003.
 United States Court of Appeals,
Second Circuit.
 Argued April 28, 1977.
Decided Oct. 18, 1977.
 
 Sol Bogen, New York City, for defendants-appellants.
 Mary-Helen Mautner, Atty., Equal Employment Opportunity Comm'n, Washington, D. C. (Robert B. Fiske, Jr., U. S. Atty., Southern District of New York, Taggart D. Adams and Louis G. Corsi, Asst. U. S. Attys., New York City, Abner W. Sibal, General Counsel, Equal Employment Opportunity Comm'n, Washington, D. C., Joseph T. Eddins, Jr., Associate Gen. Counsel, Beatrice Rosenberg, Asst. Gen. Counsel, EEOC, Washington, D. C., of counsel), for plaintiff-appellee Equal Employment Opportunity Commission.
 Ellen Kramer Sawyer, New York City (W. Bernard Richland, Corp. Counsel of the City of New York, Gerald J. Dunbar, New York City, of counsel), for appellee City of New York.
 Before SMITH, OAKES and MESKILL, Circuit Judges.
 J. JOSEPH SMITH, Circuit Judge:
 
 
 1
 Local 28 of the Sheet Metal Workers' International Association ("Local 28") and the Local 28 Joint Apprenticeship Committee ("JAC") appeal from an Affirmative Action Program and Order ("AAP&O") entered in the United States District Court for the Southern District of New York, Henry F. Werker, Judge, following a finding that Local 28 and JAC had violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., by discriminating against non-whites in various membership practices.
 
 
 2
 Local 28 and JAC appealed the finding of liability and the remedies initially imposed by the district court.[1] We affirmed the finding of liability and approved the AAP&O subject to two modifications. 532 F.2d 821 (2d Cir. 1976). A revised plan and order, pursuant to our opinion, was entered by the district court on January 19, 1977.[2] The instant appeal challenges six provisions of this revised affirmative action plan. Our previous opinion covers the factual and legal background of the appeal, and we turn directly to the questions now before us.
 
 
 3
 For the reasons outlined below, we affirm the district court's order.
 
 The Examining Board
 
 4
 In accord with Judge Werker's order, a court-appointed administrator was granted extensive supervisory power over Local 28 and the JAC. The administrator is responsible for developing and enforcing detailed plans for achieving the goals outlined in Judge Werker's decree. As part of this responsibility the administrator drafted the revised affirmative action plan finally approved by the district court. The plan calls for replacing the established Local 28 Examining Board, responsible for administering a practical test designed to evaluate the ability of applicants to perform duties required of sheet metal journeymen ("the 'hands-on' journeymen's test") with a Board of Examiners, knowledgeable in sheet metal work, consisting of one union representative, one representative selected by the plaintiffs, and one member selected by the administrator. The former Examining Board had consisted of three white members of Local 28 and a chairman. Two of the three members named to the new three-member board are non-white. Appellants challenge the provisions for a three-person board as unnecessary and improper, as reverse discrimination, and as an abridgment of union self-government.
 
 
 5
 Between 1959 and 1975 entry of judgment below the established Local 28 Examining Board had conducted only two journeymen tests, one in 1968 and one in 1969, both under constraint of arbitration awards won by the employers' Contractors' Association to force the union to increase its manpower. Only 24 men, all white, were admitted from among 339 applicants of whom about 15% were non-white, following the 1968 test. The district court concluded that "the test served more as an obstacle to, than a vehicle for, the admission of new journeymen. . . . (T)he exam clearly had an adverse impact on nonwhites, and as such, without validation, was violative of Title VII." 401 F.Supp. 484. There is ample support for the district court finding in the record. The scope of a district court's remedial powers under Title VII is determined by the purposes of the Act. International Brotherhood of Teamsters v. United States, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). Having found a violation of the Act, the district court was not only within its power but under an obligation to fashion a remedy for the violation. Albemarle Paper Co. v. Moody, 422 U.S. 405, 418, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). The substitution of the Board of Examiners for the former Examining Board was an appropriate measure designed to assure impartial administration of the journeyman test. The court order did not specify any particular racial makeup of the new board, and the charge of "reverse discrimination" raised by appellants is entirely unfounded.
 
 Direct Admission Based on Experience
 
 6
 The revised affirmative action plan permits persons who have had four years' experience in sheet metal work or reasonably related experience to apply for direct admission to the union. Applicants must satisfy the Board of Examiners that they have the requisite sheet metal experience. Direct admission was contemplated by this court in its earlier decision where we stated that
 
 
 7
 (A) heavy burden may be placed upon direct qualification and admission and transfer from allied unions as the means of reaching the 29 percent membership goal. This however seems most appropriate under the circumstances. The persons who are presently eligible for transfer into Local 28 are the persons who have felt the brunt of the union's past discriminatory practices. They are largely older individuals who have been denied entry into Local 28 in the past or who have been forced into essentially segregated unions as a result of Local 28's practices.
 
 
 8
 532 F.2d 832. Only one year's experience is required to qualify for the journeyman test. There is no reason why persons with substantially more experience, those previously excluded from Local 28 for racial reasons, should be forced to take the journeyman test. Screening by the Board of Examiners provides adequate assurance that unqualified applicants will not be admitted to the union. We find other objections to direct admission raised by appellants to be wholly without merit.
 
 Reduction and Deferment of Initiation Fees
 
 9
 Appellants object to provisions in the affirmative action plan which permit persons admitted to apprentice or journeyman status to apply for payment of reduced or deferred initiation fees. Application for reduction or deferment must be approved by the union Executive Board or the administrator. Where granted it is designed to permit new members to pay initiation fees which do not exceed the amount of the lowest initiation fee charged to any white individual who was admitted to membership at the time the non-white would have been eligible for membership absent discrimination. This provision was part of the AAP&O approved by us on the previous appeal and at that time was not challenged by appellants. Since we find the provision to be an appropriate remedy designed to eliminate the vestiges of past discrimination, Rios v. Enterprise Association Steamfitters, Local 638, 501 F.2d 622, 629 (2d Cir. 1974), we reaffirm our earlier approval of this provision.
 
 
 10
 Indenturing of Apprentices and Work Rotation by Apprentices
 
 
 11
 Under the plan approved by the district court, the JAC is required to indenture two classes of apprentices each year through July 1982, the number to be indentured to be determined by the JAC, subject to review and revision by the administrator in the light of the goals and objectives of the revised affirmative action plan.[3] Appellants challenge this provision on the ground that it interferes with union self-government, and that it is improper because it denigrates the apprenticeship examination and will not further the affirmative action goal. We reject the union's challenge on all grounds. The authority to require the regular indenture of a minimum number of apprentices is established. Rios, supra, 501 F.2d 626, 634. The administrator was justified in concluding that the long litigation history of Local 28, dating back to 1964, which resulted in a non-white population of only 3.19% in July 1974 and 5.77% in December 1976, required vigorous efforts to assure non-white union membership. Indenture of apprentices is a major route of entry to union membership and as such is appropriately subject to administrator oversight. The balancing of the need for training workers against existing economic conditions is appropriately left to his informed discretion. The number of employees ultimately hired is left to the collective bargaining process, and the indenture provision is designed to assure that non-white apprentices will be available for hire when openings occur.
 
 
 12
 To insure equal opportunity for employment of apprentices a formal referral system has been incorporated in the affirmative action plan. Apprentices are grouped according to classes with a record kept for each apprentice of the number of manhours worked. Apprentices are to be referred out in inverse order of the number of hours worked, and the JAC is directed to rotate the groupings as far as feasible to assure that no one grouping receives a disproportionate share of the work. It is essential that all apprentices have some opportunity to work in order to keep them from dropping out of the program. The rotation system does not abrogate an existing seniority system. Furthermore, counsel for the Contractor's Association conceded that job seniority "has never been the practice in the industry." (Appendix at 1493.) The forced rotation plan is a reasonable method for assuring that all apprentices get a fair allocation of work, especially in a depressed labor market where there are relatively few work opportunities.
 
 The Residence Requirement
 
 13
 The revised AAP&O provides two routes for direct admission to the union, the "hands-on" journeyman test and admission based on four years' experience. Both routes require candidates to be residents of New York City or of one of specified nearby counties.[4] The union challenges this residence requirement on the ground that the jurisdiction of Local 28 is restricted to New York City and that it is therefore inappropriate to permit non-City residents to qualify for direct admission. Appellees counter by pointing out that Local 28 never had a residence requirement and that some of its officers and members reside outside of New York City.[5] For this reason, appellees argue, it is reasonable to permit non-New York City residents to qualify for the direct admission programs. Since current union members are drawn from counties outside of the City, we see no valid reason for restricting the direct admission programs to City residents, and approve the residence requirements of the AAP&O.
 
 The Non-White Membership Goal
 
 14
 The union attacks the use of a membership goal computed on the basis of the white/non-white ratio of the labor pool in New York City, while permitting the drawing of new members from a wider area which, if used as the labor pool, arguably could substantially alter the ratio. We think this attack not well founded under the circumstances of this case. On the showing made on the first appeal we approved the 29% ratio as a goal. The district court has now sanctioned drawing applicants from a wider area on a showing that some of the present membership in fact resides in the wider area. On this record we think the jurisdiction of the union is a permissible boundary of the labor pool for setting the goal initially, absent any indication that the jurisdictional boundary is set or manipulated for purposes of discrimination. Some flexibility in permitting nearby residence is in accord with present practice and unlikely greatly to change the ratios. We note that the City of New York does not object, indeed supports the plan as approved.
 
 
 15
 It is true that we have recently held that "where a significant number of union members come from outside the union's geographic jurisdiction, the court must widen its sights; the appropriate reference area then should be that region from which the union draws its members." EEOC v. Local 14, 553 F.2d 251, 254 (2d Cir. 1977). See also Hazelwood School District v. United States, --- U.S. ----, n. 17, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977). In Hazelwood and in Local 14, however, the court was concerned with a statistical basis for a finding of discrimination. Here we have no such problem, discrimination having been established by direct evidence of long-standing practices. See EEOC v. Local 638, 532 F.2d 821, 826.[6]
 
 
 16
 Judge Werker carefully analyzed the available statistics as to the make-up of the labor pool in the jurisdictional area in arriving at the 29% ratio. If an insignificant number of union members live in New Jersey and the outlying New York counties we see no inconsistency between using a membership goal based on a New York City labor pool and permitting individual applicants for union admission to live outside the City. EEOC v. Steamfitters, 542 F.2d 579, 591 (2d Cir.), cert. denied, 430 U.S. 911, 97 S.Ct. 1186, 51 L.Ed.2d 588 (1977). Had it been established that a "significant number" of Local 28 members resided outside of New York City, it might have been necessary to redefine the relevant labor pool for Local 28 accordingly.[7] In the absence of a reliable basis for such findings we are satisfied that it was not error for Judge Werker to approve the application of the jurisdictional territory ratio to a membership drawn from a somewhat wider permissible residential area.[8]
 
 
 17
 Affirmed.
 
 MESKILL, Circuit Judge, dissenting:
 
 18
 I respectfully dissent. The majority opinion fails to apply the principles set out in the recent decision of the Supreme Court in Hazelwood School District v. United States, --- U.S. ----, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977), and our own decision in Equal Employment Opportunity Commission v. Local 14, 553 F.2d 251 (2d Cir. 1977). These decisions cast substantial doubt on the existence of illegal discrimination by these unions; there is no question that they require a remand to fix the hiring goal at a more reasonable figure.
 
 I.
 
 19
 The majority opinion suggests that the finding of discrimination and the fixing of the hiring goal are insulated from review by our prior holding in Equal Employment Opportunity Commission v. Local 638, 532 F.2d 821, 830 (2d Cir. 1976). To the contrary, the doctrine of law of the case does not bar us from reconsidering and correcting our prior erroneous holding.
 
 
 20
 It is hornbook law that an appellate court must apply the law as it stands at the time of its decision. Vandenbark v. Owens-Illinois Glass Co., 311 U.S. 538, 61 S.Ct. 347, 85 L.Ed. 327 (1941); United States v. Schooner Peggy, 5 U.S. (1 Cranch) 103, 2 L.Ed. 49 (1801). When an appellate court has previously passed on some of the questions presented, but remanded for reconsideration of others, the general practice is to avoid re-examination of the issues determined by the first appeal. However, this is not a question of judicial power, but of judicial economy. Banco Nacional de Cuba v. Farr, 383 F.2d 166, 178 (2d Cir. 1967), cert. denied, 390 U.S. 956, 88 S.Ct. 1038, 20 L.Ed.2d 1151 (1968). As Professor Moore notes, this doctrine of law of the case is not a barrier to "self-correction of judicial error." 1B Moore's Federal Practice P 0.404(1), at 401 (2d ed. 1974). Thus, a court is always free to exercise its discretion to reconsider its previous rulings in a case before it.[1] Messenger v. Anderson, 225 U.S. 436, 444, 32 S.Ct. 739, 56 L.Ed. 1152 (1912) (Holmes, J.); Perrone v. Pennsylvania R. Co., 143 F.2d 168, 169 (2d Cir. 1944) (Frank, J.); White v. Higgins, 116 F.2d 312, 317 (1st Cir. 1940) (Magruder, J.); Higgins v. California Prune & Apricot Grower, Inc., 3 F.2d 896 (2d Cir. 1924) (L. Hand, D. J.).
 
 
 21
 When a change in controlling law intervenes between two proceedings in the same court, the judgment should be modified to conform to current law insofar as it requires a future course of conduct. This is true whether the change is the result of statutory amendment, System Federation v. Wright, 364 U.S. 642, 81 S.Ct. 368, 5 L.Ed.2d 349 (1961); Pennsylvania v. Wheeling & Belmont Bridge Co., 59 U.S. (18 How.) 421, 431-32, 15 L.Ed. 435 (1855), or an intervening decision by the same court, Davis v. United States 417 U.S. 333, 94 S.Ct. 2298, 41 L.Ed.2d 109 (1974) (intervening decision by same Court of Appeals); Hampton v. Graff Vending Co., 516 F.2d 100, 103 (5th Cir. 1975) (same). Thus, where a party, as here, is under a continuing injunction barring conduct once considered unlawful, but now permitted, it is an abuse of discretion not to conform the injunction to prevailing law. System Federation v. Wright, supra, 364 U.S. at 64650, 81 S.Ct. 368 (Harlan, J.).[2] See United States v. Swift & Co., 286 U.S. 106, 114-15, 52 S.Ct. 460, 76 L.Ed. 999 (1932) (Cardozo, J.).
 
 
 22
 Even though the challenged decree commands actions thought beneficent, these principles must be applied. Thus, in Pasadena City Board of Education v. Spengler, 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976), the Supreme Court was faced with a decree meant to prevent re-segregation of a school district already integrated by court order. After the decree was entered, the school district did not appeal. Subsequently, the Supreme Court's decision in Swann v. Charlotte-Mecklenberg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), made it clear that the district court had exceeded its authority in ordering such relief. The defendants sought a modification of the injunction under Fed.R.Civ.P. 60(b)(5), which was denied, and the Court of Appeals affirmed this decision. The Supreme Court reversed. It held that law of the case did not insulate the decree from attack and that, insofar as it governed future conduct, the district court should have conformed it to current law. 427 U.S. at 437-38, 96 S.Ct. 2697.
 
 
 23
 There can be no doubt that Hazelwood and Local 14 significantly changed the law, delimiting for the first time the standard for selecting the labor force used as a benchmark in establishing a prima facie case of discrimination. Hazelwood, supra, --- U.S. at ----, 97 S.Ct. 2736; Local 14, supra, 553 F.2d at 254. The majority opinion as much as concedes their relevance. It states:
 
 
 24
 It is true that we have recently held that "where a significant number of union members come from outside the union's geographic jurisdiction, the court must widen its sights; the appropriate reference area then should be that region from which the union draws its members." EEOC v. Local 14, 553 F.2d 251, 254 (2d Cir. 1977). See also Hazelwood School District v. United States, --- U.S. ----, n.17, 97 S.Ct. 2736, 53 L.Ed.2d 768 (June 28, 1977). In Hazelwood and in Local 14, however, the court was concerned with a statistical basis for a finding of discrimination. Here we have no such problem, discrimination having been established by direct evidence of long-standing practices. See EEOC v. Local 638, 532 F.2d 821, 826.
 
 
 25
 553 F.2d at 2 (footnote omitted). This circular argument proves nothing at all. The discrimination that was "established by direct evidence" was premised upon the challenged test, which cannot possibly be its own justification. Hazelwood and Local 14 set out the test to be used in establishing discrimination, and conclusively demonstrate that the finding of liability in the earlier proceedings was based on incorrect standards. I am at a loss to see how a determination of liability under an erroneous test insulates itself from judicial scrutiny once the correct test is laid out by the Supreme Court. The majority should concede that we have no discretion to apply law of the case when the holding of the first appeal has been discredited by the Supreme Court. Zdanok v. Glidden Co., 327 F.2d 944, 951 (2d Cir.) (Friendly, J.), cert. denied, 377 U.S. 934, 84 S.Ct. 1338, 12 L.Ed.2d 298 (1964); Higgins v. California Prune & Apricot Grower, Inc., supra, 3 F.2d at 897 (2d Cir. 1924) (L. Hand, D. J.). Because neither the district court nor the first panel that heard this case had these decisions before it, the case should be remanded for reconsideration in the light of subsequent developments.
 
 II.
 
 26
 In this case, the plaintiffs established their prima facie case of discrimination by proving that the percentage of minority workers in the union was substantially less than the percentage of minority workers in the population. The district court, and now the panel majority, endorse this view. However, under our decision in Local 14, this finding resulted from the application of a clearly erroneous legal standard.
 
 
 27
 Title VII is addressed only to discrimination which has occurred since the effective date of the Act. Hazelwood, supra, --- U.S. ----, 97 S.Ct. 2736; International Brotherhood of Teamsters v. United States, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). The district court, the original panel decision, and the majority here, however, looked to employment figures which included pre-Act membership in the union to establish a prima facie case of discrimination. In Hazelwood, the Court of Appeals concluded that a school district which had 1.8 percent minority teachers, in an area whose labor pool was 5.7 percent minority, had unlawfully discriminated. In vacating the decision, the Supreme Court stated:
 
 
 28
 The Court of Appeals totally disregarded the possibility that this prima facie statistical proof in the record might at the trial court level be rebutted by statistics dealing with Hazelwood's hiring after it became subject to Title VII. Racial discrimination by public employers was not made illegal under Title VII until March 24, 1972. A public employer who from that date forward made all its employment decisions in a wholly nondiscriminatory way would not violate Title VII even if it had formerly maintained an all-white work force by purposefully excluding Negroes. For this reason, the Court cautioned in the Teamsters opinion that once a prima facie case has been established by statistical work force disparities, the employer must be given an opportunity to show "that the claimed discriminatory pattern is a product of pre-Act hiring rather than unlawful post-Act discrimination." (--- U.S. at ----, 97 S.Ct. at 2742).
 
 
 29
 The record in this case showed that for the 1972-1973 school year, Hazelwood hired 282 new teachers, 10 of whom (3.5%) were Negroes; for the following school year it hired 123 new teachers, five of whom (4.1%) were Negroes. Over the two-year period, Negroes constituted a total of 15 of the 405 new teachers hired (3.7%). Although the Court of Appeals briefly mentioned these data in reciting the facts, it wholly ignored them in discussing whether the Government had shown a pattern or practice of discrimination. And it gave no consideration at all to the possibility that post-Act data as to the number of Negroes hired compared to the total number of Negro applicants might tell a totally different story.
 
 
 30
 --- U.S. at ----, 97 S.Ct. at 2743 (footnotes omitted). We reached the identical conclusion in Local 14, supra, 553 F.2d at 254.
 
 
 31
 It is by no means a futile gesture to allow this union a chance to produce such evidence. In Local 14 we overturned a finding of liability against another construction union whose jurisdiction was New York City. That union had a minority membership of 6.5 percent; however, when its post-Act hiring was compared to the appropriate population figures, we found the question of discrimination sufficiently doubtful to remand the case for a proper hearing. This union had a minority membership of 5.77 percent in December, 1976, fairly close to the figure in Local 14. As the district court found, less than one-third of the membership has joined this union since the effective date of Title VII. See Local 638, supra, 532 F.2d at 824; 401 F.Supp. at 474. Moreover, the record does not reveal how much control the union had over direct transfers and organization of non-union shops.[3] Nor does the majority take account of the extremely depressed conditions in the construction industry in New York during the period in question. Finally, the district court did not have before it the "applicant-flow data" deemed essential by the Supreme Court in Hazelwood. See --- U.S. at ----, 97 S.Ct. 2736 (Brennan, J., concurring). Without clear findings on these matters, we are in a position to affirm neither the finding of discrimination nor the broad remedial order. As the Hazelwood Court concluded:
 
 
 32
 It is thus clear that a determination of the appropriate comparative figures in this case will depend upon further evaluation by the trial court. As this Court admonished in Teamsters, "statistics . . . come in infinite variety . . . . (T)heir usefulness depends on all of the surrounding facts and circumstances." (431 U.S. at 340, 97 S.Ct. 1843). Only the trial court is in a position to make the appropriate determination after further findings. And only after such a determination is made can a foundation be established for deciding whether or not Hazelwood engaged in a pattern or practice of racial discrimination in its employment practices in violation of the law.
 
 
 33
 --- U.S. at ----, 97 S.Ct. at 2744 (footnote omitted).
 
 
 34
 I do not mean to suggest that this union's history in racial matters is commendable. The blatant pre-Act discrimination is deplorable, the very most that can be said for it is that it was not unlawful. Furthermore, there have been enough subsequent acts of discrimination to support a conclusion that compliance with Title VII has been, at most, grudging and half-hearted.[4] Nonetheless, Title VII does not empower us to right all the wrongs of society, but only to correct specific illegal conduct. Equal Employment Opportunity Commission v. Enterprise Ass'n Steamfitters Local 638, 542 F.2d 579, 592 (2d Cir. 1976), cert. denied, 430 U.S. 911, 97 S.Ct. 1186, 51 L.Ed.2d 588 (1977). It may well be that the plaintiffs in this action could prevail under a proper test. However, no matter how "just" the result appears, we cannot base a finding of liability on "a wholly inappropriate legal standard of discrimination," Hazelwood, supra, --- U.S. at ----, 97 S.Ct. at 2744 (Brennan, J., concurring), as was done here. Thus, further factfinding is required, which can be accomplished only if the case is remanded to the district court. Id. (majority opinion).
 
 III.
 
 35
 There is a second fundamental error in the determination of liability. The district court used the New York City minority population as the standard to determine the existence of discrimination. Under our recent decision in Local 14, this was clearly erroneous. As Judge Van Graafeiland stated for a unanimous panel:
 
 
 36
 (W)here a significant number of union members come from outside the union's geographic jurisdiction, the court must widen its sights; the appropriate reference area then should be that region from which the union draws its members.
 
 
 37
 553 F.2d at 254. In June, the Supreme Court, in Hazelwood, "highlight(ed) the importance of the choice of the relevant labor market area." --- U.S. at ---- n.17, 97 S.Ct. at 2744.[5] The majority ignores the district court's error in this crucial decision.[6]
 
 
 38
 The district court below determined the minority population of New York City to be 29 percent, which it used as a benchmark. 401 F.Supp. at 488-89. This was clearly incorrect in light of Hazelwood and Local 14. The error is underscored by the fact that the court below expanded the areas from which minority membership would be drawn on the ground that:
 
 
 39
 If it be true that many of the present membership reside outside the limits of New York City there is no reason why applicants should be restricted to New York City.
 
 
 40
 421 F.Supp. 603, 618. It may be true, as the majority states, that this is a careful finding of fact that an "insignificant" part of the membership lives outside of New York. I must note, however, that "insignificant" is generally not synonymous with "many." If so, it belies both our earlier decision that the relevant labor pool was "the Metropolitan area," 532 F.2d at 831, and the position taken on this appeal by the EEOC that "many of the present membership reside outside the limits of New York City." Brief of the EEOC at 19. It is abundantly clear that a further hearing is necessary, at which proper statistical evidence could be taken.
 
 IV.
 
 41
 The crucial nature of this evidence is illustrated by a comparison with the Local 14 case. Local 15,[7] the union involved there, was another construction union whose jurisdiction is New York City. Just as here, there was ample evidence of blatant pre-Act discrimination, resistance to change and substantial individual acts of discrimination after the Act. However unpleasant such conduct is, it does not necessarily make out a prima facie "pattern and practice" case under Title VII. In that case, we indicated that the proper hiring goal was approximately 16.2 percent. Here, four out of every five members taken into the union have come from the apprenticeship program. Minority participation in that program rose from .37 percent in 1965 to 21.8 percent in 1967, fell to 9.77 percent in 1973, and rose to 14 percent in 1974. These figures cast substantial doubt on the finding that the apprenticeship program was discriminatory. Compare Local 14, supra, 553 F.2d at 254; Hazelwood, supra, --- U.S. at ----, 97 S.Ct. 2736. Moreover, the district court confusingly lumped together pre and post-Act discrimination in such areas as the organization of non-union shops, preventing meaningful analysis of the record. 401 F.Supp. at 485-86. There is thus some possibility that the union is not liable under Title VII. In any event, if liability is found, a proper remedy cannot be formulated until the scope of the violation is known. The majority's holding makes this task impossible.
 
 V.
 
 42
 Even if the majority's affirmance of the finding of liability is correct, the case still should be remanded for the formulation of a proper remedy. If the district court fixes the proper figure for determining the existence of discrimination, then it logically follows that the same figure is the appropriate target in any affirmative action plan imposed. The rule in Title VII cases, as in all others, is that the remedy is to be fitted to the wrong. Thus, in Albemarle Paper Co. v. Moody, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), the leading case on remedies under Title VII, the Court explicitly adopted this familiar principle:
 
 
 43
 "The general rule is, that when a wrong has been done, and the law gives a remedy, the compensation shall be equal to the injury. The latter is the standard by which the former is to be measured. The injured party is to be placed, as near as may be, in the situation he would have occupied if the wrong had not been committed." Wicker v. Hoppock (73 U.S. 94) 6 Wall. 94, 99 (18 L.Ed. 752) (1867).
 
 
 44
 Id. at 418-19, 95 S.Ct. at 2372. See Dayton Board of Education v. Brinkman, --- U.S. ----, ----, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977); Milliken v. Bradley, 418 U.S. 717, 738, 744, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974). We expressed the same views in Local 14, where we stated:
 
 
 45
 When a District Court finds that discriminatory practices on the part of a union or an employer have prejudiced minority workers, it should frame its relief with an eye toward remedying the wrong, see generally Albemarle Paper Co. v. Moody, 422 U.S. 405, 421 (95 S.Ct. 2362, 45 L.Ed.2d 280) (1975), and should interfere with the defendant's operations no more than is necessary to accomplish this result.
 
 
 46
 553 F.2d at 256.
 
 
 47
 The majority simply ignores this principle. Instead, it holds, in effect, that the district court, once it has made a finding of discrimination, is free to select a hiring goal on an arbitrary basis, or no basis at all. There can be no other explanation for a holding that, even if 16.2 percent is the appropriate figure for determining the existence of discrimination, 29 percent is the hiring goal which must be set to remedy that discrimination. A simple example will demonstrate the absurdity of this position.
 
 
 48
 Assume that two unions, in related trades, have jurisdiction over a city whose minority population is 30 percent. The metropolitan area of which the city is a part has an overall minority population of 15 percent. Both unions' membership live throughout the metropolitan area. On the effective date of the Act, neither union has any minority members.
 
 
 49
 The first union in this example admits 15 percent minority members after the Act becomes effective; the second union only 10 percent. Under Hazelwood and Local 14, the first union is in full compliance with Title VII. The second union, however, would be in violation of the Act since it falls short of the 15 percent goal. A minority membership goal of 30 percent within five years could be set by the district court, following the majority reasoning of this case.
 
 
 50
 After five years, if the second union has succeeded in raising its overall minority membership to 20 percent, it would be in violation of the affirmative action plan imposed. At the same time, the first union, with its 15 percent post-Act minority membership, would be in full compliance with the law. I do not believe that the drafters of Title VII envisioned such an incongruous result.
 
 VI.
 
 51
 Finally, this decision will, on balance, retard rather than advance the achievement of non-discrimination in employment. While it may lead to somewhat "more" integration in the central cities, it will halt efforts to integrate suburban employers. Thus, if a union whose jurisdiction is Nassau and Suffolk Counties were found liable under Title VII, I assume that the majority, in order to be consistent, would set the hiring goal by reference to the small minority population of those suburban counties. It would presumably be error to consider New York City's far more substantial minority population. Although this result appears to be compelled by today's decision, it is clear that it will hardly advance the cause of integration. If we are to eliminate the national disgrace of employment discrimination, we must widen, and not restrict, our horizons. I believe that the majority, proceeding from the best of motives, jeopardizes the cause Title VII is designed to serve.[8]
 
 
 52
 I would vacate the decision of the district court, and remand for a hearing under proper standards.
 
 
 
 [1]
 While the initial appeal to this court was pending, the AAP&O was modified by the district court upon motion of the Equal Employment Opportunity Commission and the New York State Division of Human Rights in the light of changed working and employment conditions in the sheet metal industry in New York City
 
 
 [2]
 The district court's findings and conclusions of law are reported at 401 F.Supp. 467 (S.D.N.Y.1975); the first AAP&O is reported at 421 F.Supp. 603 (S.D.N.Y.1975)
 
 
 [3]
 The plan also called for indenturing no less than 36 apprentices by February 1977, and another class of apprentices by July 1977. P 19, Appendix 1846
 
 
 [4]
 For the "hands-on" journeyman test the counties listed are Nassau, Suffolk and Westchester in New York, and Essex and Passaic in New Jersey. Residence for the direct admission based on four years' experience includes the above counties, plus Bergen, Hudson and Union counties, New Jersey. P 7(c), Appendix 1839; P 12(a), Appendix 1842. No explanation is apparent for differing residence eligibilities for the two routes of entry
 
 
 [5]
 EEOC brief at 19; City of New York brief at 20; Appendix at 968; Appendix at 971-972
 
 
 [6]
 The argument that the union clearly had no control over the racial composition of transfers from sister locals or men in newly organized shops is refuted by the record in the earlier appeal, where there was evidence that Local 28 denied transfer to blacks while admitting whites from the same union with no greater qualifications
 
 
 [7]
 The labor pool figures would then be adjusted to include the entire area from which current members and applicants are drawn. If this were done, a new goal could be set based on the enlarged area but adjusted to reflect the relatively smaller number of union members drawn from the outlying areas rather than New York City as a result of the effect of distance, cost and time of travel, and other related factors
 
 
 [8]
 We fear that our dissenting brother has misconceived the basis for our earlier opinion in this case, 532 F.2d 821 (1976). It was based on direct and overwhelming evidence of purposeful racial discrimination over a period of many years. It did not rely on inferences from racial ratios of population and employment in the area to establish a prima facie case of discrimination
 We pointed out, 532 F.2d at 825-27, some examples of the direct methods employed to deny members of racial minorities entrance to the union, including discriminatory examinations for entrance to the apprenticeship program, cram courses paid for by union funds for sons and nephews of members, unavailable to minority applicants, refusal to accept the blowpipe workers for membership because of their predominantly minority make-up, consistent discrimination in favor of white applicants for transfer from sister construction unions while denying transfer to blacks with equivalent qualifications, issuance of temporary work permits to white members of allied construction unions, some from far away, while denying them to minority group sheet metal workers already residing in the New York City area.
 We are not limited here, therefore, in determining proper relief by Local 14, 553 F.2d 251 (2d Cir. 1977), nor by Hazelwood School District v. United States, --- U.S. ----, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977), which were concerned with ratios as prima facie proof of discrimination. We see no need, therefore, to discuss the doctrine of the law of the case in relation to "self correction of judicial error." Nor do we see the necessity for a retrial of the issue of racial discrimination, further prolonging this litigation after more than thirteen years of effort by state and federal tribunals to end the thoroughly proven discrimination.
 
 
 [1]
 Of course, the Supreme Court is not bound by our law of the case. 1B Moore's Federal Practice P 0.404(10), at 574 (2d ed. 1974). Since Hazelwood and Teamsters are decisions of the Supreme Court, our prior decisions to the contrary in this case will carry no weight on certiorari, and applying law of the case is an exercise in futility. White v. Higgins, 116 F.2d 312, 317 (1st Cir. 1940) (Magruder, J.). The only effect can be further proceedings and waste of time, precisely the evils which law of the case is meant to avoid
 
 
 [2]
 In Wright, the conduct involved, organizing a "union shop," had actually been unlawful at the time it was enjoined. Here, by contrast, the injunction was based upon an erroneous construction of Title VII. Also, Wright was a stronger case for applying law of the case, since it involved a consent decree rather than, as here, a fully litigated controversy
 Both Swift and Wright state that an injunction must be modified if transformed by a change of law into an "instrument of wrong." However, Wright makes it clear that this means merely that a party is restrained from carrying out what has become a legal course of conduct. The opinion states:
 Had the 1945 decree simply represented relief awarded by the District Court after a trial of the action instituted by petitioners, there could be little doubt but that, faced with the 1951 amendment to the Railway Labor Act, it would have been improvident for the court to continue in effect this provision of the injunction prohibiting a union shop agreement as being unlawful per se, or its use as an instrument to effectuate other statutorily forbidden discriminations. That provision was well enough under the earlier Railway Labor Act, but to continue it after the 1951 amendment would be to render protection in no way authorized by the needs of safeguarding statutory rights at the expense of a privilege denied and deniable to no other union.
 364 U.S. at 648, 81 S.Ct. at 371. See Theriault v. Smith, 523 F.2d 601 (1st Cir. 1975) (vacation of consent decree to conform with subsequent decision of Supreme Court); 11 C. Wright & A. Miller, Federal Practice and Procedure §§ 2863, 2961 (1973); Developments in the Law Injunctions, 78 Harv.L.Rev. 994, 1082 (1965).
 
 
 [3]
 As is clear from the district court opinion, the discriminatory organization of non-union shops mentioned in the majority opinion at 36 n.8 took place in "the late 1950's and early 1960's," 401 F.Supp. at 485, before the effective date of the Act
 
 
 [4]
 It is for the district court to determine if these constitute a "pattern and practice" of discrimination or if they call for individual treatment. Local 14, supra, 553 F.2d at 255-56
 
 
 [5]
 Hazelwood dealt with the exact opposite of this situation. There, a district court failed to include the minority population of a central city in a lawsuit against a largely white suburb. It is inconceivable, however, that a different legal standard determines the existence of discrimination in cities and suburbs
 
 
 [6]
 One commentator has noted that "the geographical delimitation of the relevant population can be the deciding factor in a case." Lopatka, A 1977 Primer on the Federal Regulation of Employment Discrimination, 1977 U. Ill. L.F. 69, 76
 
 
 [7]
 Local 14 itself was found liable for discrimination. The remand was ordered for Local 15, a companion union in the same case
 
 
 [8]
 As we stated in Local 14 :
 We must carefully balance the need for effective enforcement of the Act against overzealous enforcement which can only lead to resentment and a resistance to change.
 553 F.2d at 255.