936

In the Matter of STATE COMMISSION FOR HUMAN RIGHTS, Petitioner, *v.* MELL FARRELL, Individually and as President of Local Union No. 28 of Sheet Metal Workers' International Association of Greater New York, et al., Respondents.

Supreme Court, Special Term, New York County, February 8, 1967.

*Henry Spitz* and *Sidney Kant* for petitioner. *Louis J. Lefkowitz, Attorney-General* (*George Zuckerman* of counsel), for petitioner. *Cohen & Glickstein* (*Samuel Harris Cohen* of counsel), for Local Union No. 28, respondent. *Breed, Abbott & Morgan* (*Thomas A. Shaw* of counsel), for Mechanical Contractors Assn. and others, respondents. *Rosenthal & Goldhaber* (*Benjamin Rosenthal* of counsel), for Sheet Metal Contractors Assn. and others, respondents. *Robert L. Carter, Maria L. Marcus* and *Lewis M. Steel* for N. A. A. C. P., *amicus curiæ.*

WILLIAM C. HECHT, JR., J. This is an application by the State Commission for Human Rights to enforce respondents' compliance with an order of this court, dated November 6, 1964, made by Mr. Justice JACOB MARKOWITZ and entered upon consent of all parties. Said order enforced a prior order of the State Commission, issued after a determination that respondents had unlawfully discriminated against Negroes in selecting and appointing applicants to the sheet metal apprenticeship training program. This court order, arrived at after a great expenditure of time and effort by the court and the parties, required the

adoption of nondiscriminatory standards for selection, by respondents, of apprenticeship candidates. Respondent Local Union No. 28 of Sheet Metal Workers' International Association of Greater New York and respondent Joint Apprenticeship Committee (employers' association in the Sheet Metal Industry in New York) adopted certain " Standards for the Admission of Apprentices ", dated October 14, 1964, which were made a part of the order of November 6, 1964.

In his decision of August 24, 1964 (43 Misc 2d 958), Mr. Justice MARKOWITZ determined that prospective applicants who met age, physical and educational requirements, were to be selected for apprenticeship training on the basis of aptitude tests and interviews. The aptitute tests were to be given by the New York City Testing Center " or equivalent testing center "; " two hundred per cent of the number of apprentices ultimately to be appointed *who have achieved the highest rating in an independently conducted aptitude test* will be interviewed "; " the maximum point score one can achieve on the test will be 750 and on the interview 150. *Appointments will be made solely and exclusively on the point score."* (Emphasis added.)

In the order of November 6, 1964, the court effectuated that determination by ordering that,

" 2. Said Local Union 28 and said Committee shall select apprentices on the basis of qualifications alone by designating and approving for their sheet metal apprenticeship training program those applicants who are best qualified therefor; the apprentices shall be appointed in order of rank, without regard to race, creed, color or national origin, after they have displayed qualifications in sufficient measure to meet the requirements established by the October 14, 1964 Standards.

" 3. In evaluating the requisite minimum qualifications of each applicant and the comparative qualifications of all applicants, said Local Union 28 and said Committee *shall base their evaluation on the objective standards, tests and requirements set forth in the October 14, 1964 Standards.*

" 4. Said Local Union 28 and said Committee shall accord to all applicants who have heretofore applied and to all applicants who may hereafter apply for apprenticeship training *equality of treatment in determining their eligibility* to be appointed to the apprenticeship training program and *shall judge all applicants by the same set of objective standards.* * * * " (Emphasis added.)

The afore-mentioned " Standards of October 14, 1964 ", repeat the commitment that, " all applicants * * * shall be accorded equality of treatment in determining their eligibility

to be appointed to the apprenticeship training program and shall be judged by the same set of objective standards '' and further provide that, '' Each applicant who meets the age, educational and physical requirements shall be given an aptitude test and *based upon the aptitude scores,* personal interviews will be granted ''. (Emphasis added.)

After providing that the aptitude tests are to be given by the New York University Testing and Advisement Center, the Standards again recite that, '' 200% of the number of apprentices to be appointed *who achieved the highest aptitude test scores* shall be given a personal interview ''. (Emphasis added.)

Pursuant to said order, respondents have on two prior occasions selected apprenticeship classes in accordance with the '' Standards of October 14, 1964 ''. An aptitude test for the selection of a third apprenticeship class was held on November 12, 1966. There were 147 examinees, of whom 32 were Negroes, and 24 of said Negro examinees passed. One Negro applicant obtained a perfect score and 12 of the first ranking 15 applicants were Negroes. The test results were forwarded to respondent Joint Apprenticeship Committee on or about November 30, 1966 and arrangements were made for physical examinations and interview tests for the appropriate number of successful applicants. Thereafter, Dr. Wallace Gobetz, who had personally supervised the testing on behalf of the New York University Testing and Advisement Center, informed respondents that he was disturbed by the unusually large number of high scores achieved on the test because he assumed that the applicant group was representative of '' the United States high school senior population '' and the test results did not match published norms established for said tests as a result of wide-scale testing of said '' United States high school senior population ''. Dr. Gobetz requested information from respondents concerning the educational background of the applicant group. Upon learning that his basic assumption was incorrect, i.e., that the applicant group was not representative of the test population upon which the standardized tests were validated and norms established, and, indeed, represented an educationally and culturally deprived segment of society, Dr. Gobetz expressed the opinion that the scores achieved on the November, 1966 examination, were '' statistically improbable ''. It is clear from the affidavit of Mr. Bernard Katzen, Vice-Chairman of the State Commission, that the union and employer representatives were well aware that Negro and Puerto Rican applicants had received tutoring assistance from organizations whose function it is to assist and prepare nonwhites to qualify for entry into various building trade

apprenticeship programs. Dr. Gobetz was evidently informed of this fact, as a possible explanation for the test results, for he expresses the further opinion that " the extraordinary scores obtained in the November, 1966 examination could not have been secured solely through the methods of tutoring and remedial instruction currently available and known to me ". Dr. Gobetz' conclusion was that the results of the testing on this occasion did not accurately represent a measurement of the aptitudes of the applicants for the skills tested.

On the basis of their conferences with Dr. Gobetz (wherein it was also discovered that Dr. Gobetz had given the identical test battery on all three occasions), representatives of respondent Joint Apprenticeship Committee appear to have adopted several independent conclusions: to wit, that (1) two Negro applicants who had taken, and failed one of the earlier tests, simply memorized the entire test and their scores were not a valid indicator of aptitude; (2) the tutoring afforded all Negro applicants was somehow improper and the applicants " who did not have the benefit of what appears to be ' unfair preparation opportunities ' were disadvantaged "; and (3) " that it reasonably can be concluded that the applicants who scored near perfect scores, and in such quantities, were not persons with mechanical aptitudes, as is required by the Sheet Metal Industry ".

Respondents determined that they would not further process these applicants, but would require all 147 of them to take another aptitude test, to be devised by Dr. Gobetz, and that the Joint Apprenticeship Committee would pay the entire cost of re-examination. All spokesmen for respondents remain vague as to the nature of this proposed re-examination. It would seem that it is respondents' intention that Dr. Gobetz construct an entirely new test battery, one which is not composed of standardized tests and therefore one which is not presently available to practitioners in the psychological testing field.

Respondents argue that their proposed actions are not violative of the November 6, 1964 court order since that order provides that they select for apprenticeship training " those applicants who are best qualified therefor ". Respondents assert that they are not bound by the results of any particular test, especially one of questionable validity, but may employ any procedure which leads to the selection of the " best qualified " applicants.

The investigation by the State Commission disclosed that the November, 1966 test was held and proctored as usual. Commission Vice-Chairman Katzen specifically inquired as to whether respondents had any proof of unfair foreknowledge, cribbing or other questionable procedures on the part of the Negro appli-

cants which would lend justification to respondents' contemplated action and respondents' representatives admitted that they had none. Neither did they have any tangible evidence of fraud or misconduct on the part of the examiners or anyone else. Indeed, they had not even seen fit to make any investigation to determine if such evidence existed. Rather, they chose to justify their actions simply on the basis of conjecture and suspicion arising from the alleged " statistical improbability " of the test results, and on their belief that the above-cited order of November 6, 1964 presented no obstacle to their proposed action. Upon these facts, the State Commission refused to acquiesce in respondents' proposed action.

Certain charges made by Dr. Gobetz, with respect to the propriety of tutoring of the Negro applicants and its effect upon the validity of test results, required our consideration. As indicated above, respondents were not unaware that groups such as the Workers' Defense League were engaged in tutoring Negro and Puerto Rican applicants for building trades apprenticeship programs. No objection to tutoring was voiced by them and no prohibition of tutoring was recited in the court order of November 6, 1964, or the attached " Standards ". Either respondents gave no thought whatever to the subject or shared the views held by Dr. Gobetz that individual mental development has so crystallized by late adolescence that no amount of ordinary tutoring can have a significant effect upon scores to be achieved by this applicant age group on any standardized aptitude tests.

It is Dr. Gobetz' present contention that the tutoring given to these Negro applicants was not " ordinary " tutoring, but rather something improper and unfair. Apparently Dr. Gobetz defines " ordinary tutoring " as that coaching which provides merely an exposition of the physical format and mechanics of administration of standardized tests. The instant tutoring course involved a program of extensive coaching with respect to the general subject matter of standardized aptitude tests and included sample problem solving. Dr. Gobetz charges that tutoring with respect to test subject matter constitutes professionally unethical conduct, since " novelty " is an essential part of any aptitude test and such tutoring dissipates this essential element. His views with respect to the need for " novelty " is shared by Dr. George Bennett, president of the Psychological Corporation.

An equally eminent expert, Dr. Kenneth B. Clark, has submitted an affidavit, both on petitioner's behalf and in conjunction with the arguments of the National Association for the Advancement of Colored People, which appears *amicus curiæ* by consent

of all parties. Dr. Clark agrees that "ordinary" tutoring of applicants who are representative of the United States high school population has proven to have little effect upon the scores they achieve on standard aptitude tests. He otherwise takes issue with the opinions and conclusions expressed by Drs. Gobetz and Bennett. In Dr. Clark's view, the tutoring given here was extraordinary remedial education of a nonrepresentative group, the educationally and culturally disadvantaged. He totally rejects the basic conclusion that disadvantaged adolescents are beyond help, and finds neither impropriety nor ethical misconduct in the tutoring given. (The NAACP has submitted further affidavit testimony by Drs. Irwin Katz, Leon A. Rosenberg and Dan W. Dodson which confirm and support the views of Dr. Clark. The court has not considered these affidavits in reaching its determination, both because of technical procedural irregularities with respect to their submission and because they present merely cumulative evidence of what has already been adequately presented. Suffice it to say that the views held by Drs. Gobetz and Bennett do not command universal acceptance among the members of their profession.)

Mr. Dennis Derryck, who conducted the tutoring program on behalf of the Workers' Defense League, submits an affidavit wherein he sets forth a detailed explanation of the course conducted, the content thereof and the teaching methods employed. The areas of instruction corresponded directly with the areas of testing announced, in advance, in the "Standards of October 14, 1964", namely, mental alertness, mechanical reasoning, spatial relations, mathematical concepts and mathematical problem solving. In talking with applicants who had taken the first two tests, Mr. Derryck learned the general nature of the test problems given. He examined over 50 standard aptitude tests — which are published by organizations such as Dr. Bennett's corporation and which are freely available to any psychological testing professional — and devised the curricula of the tutoring course, which encompassed "a fair synthesis of subject matter, areas and types of questions covered by such aptitude tests." He also avers that there is no question with respect to the professional ethical propriety of this approach, since it is, in principle, the same approach employed in "how to pass examinations" books, relating to civil service, college entrance and aptitude tests in various skills and professions, which may be found on the shelves of any book store in this city. Mr. Derryck swears unequivocally that he had no foreknowledge of the precise test Dr. Gobetz intended to give in the November, 1966 examination and at no time during the tutoring course were the applicants

drilled in answering the specific aptitude battery employed in the November, 1966 test, or any other specific aptitude test.

It has not been here established that there was any impropriety with respect to the scores achieved by the applicants on the November, 1966 test, either as a result of Mr. Derryck's tutoring or otherwise. Indeed, doubt has been cast upon a number of basic assumptions which led to the conclusions that the test results were " statistically improbable ". That conclusion, unsupported by any shred of tangible evidence of impropriety, cannot support the further conclusions reached by respondents and the resultant actions taken by them. Neither can respondents justify their intention — implicit in the present position taken — to void any and all future test results which fail to satisfy Dr. Gobetz' requirement for " statistical probability ".

In their selection of " the best qualified " applicants, respondents were not left free to adopt standards which are written on the wind. Rather, it was ordered that they afford to all applicants " equality of treatment in determining their eligibility " and that their selection be based on " the objective standards, tests and requirements set forth in the October 14, 1964 Standards." The obligation to select the most appropriate test rests with the independent expert selected to conduct the testing. The fact that said expert has certified, and respondents have accepted and acted upon, the results of prior examinations employing the identical test battery, indicates that at least as far as they are concerned there are no doubts as to the validity of the test itself as a predictor of aptitude for sheet metal work. If it was error to have administered the identical test on three successive occasions, where the " Standards of October 14, 1964 " specifically provide that unsuccessful applicants may seek retesting, the fault certainly does not lie with the reapplicants and respondents will not be heard to complain that these individuals have secured the advantage of test-taking sophistication as a result of their prior experience. The contention that the remedial tutoring given educationally and culturally deprived Negroes and Puerto Ricans " disadvantaged " the other applicants is novel but unconvincing. Neither the order of November 6, 1964 nor the annexed "Standards of October 14, 1964 " proscribed tutoring and each applicant was at liberty to seek tutoring or not, as he saw fit. Interestingly, respondents do not appear to have investigated, or even considered, the possibility that applicants, other than the Negro and Puerto Rican boys, had taken a tutoring course.

The expectation that applicants will come to an aptitude test totally unaware of the mysteries which await them is, in this

test-conscious, test-oriented, test-saturated world of ours, a perhaps noble but indeed naive wish. Moreover, the proffered solution for restoring "novelty" to the testing situation, is unacceptable even by respondents' own standards. A unique test, i.e., one neither standardized nor available in the present literature, would have no validity, for there would exist no established norms against which to test the "statistical probability" of the results. If on the other hand, these applicants were given simply another version of the published, standardized tests, there is no reason to believe, on the evidence submitted herein, that the results would be significantly different from those obtained from the November, 1966 test. In all events, absent proof of impropriety, any retesting would be violative of the mandate for equality of treatment. Accordingly, the petition is, in all respects, granted.