**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,**

**v.**

**LOCAL 638 ... Local 28 of the Sheet Metal Workers International Association, Local 28 Joint Apprenticeship Committee, Sheet Metal and Air Conditioning Contractors' Association of New York City, et al., Defendants.**

No. 71 Civ. 2877 (RLC).

United States District Court, S.D. New York.

Sept. 30, 1987.

E.E.O.C., New York City, Robert L. Williams, Regional Atty., Tanya C. Lewis, Sr. Trial Atty., James L. Lee, Supervisory Trial Atty., Anna M. Stathis, Trial Atty., for plaintiff.

Edmund P. D'Elia, P.C., New York City, for defendants; Edmund P. D'Elia, Jamie K. Ficco, Ian J. Gazes, of counsel.

## OPINION

ROBERT L. CARTER, District Judge.

This is the latest chapter in a saga of employment discrimination which entered the courts of the State of New York over 23 years ago and has persisted in federal court for the last 16 years. Still in controversy at this late date are backpay claims pursuant to Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e *et seq.*[1]

The Equal Employment Opportunity Commission ("EEOC") has prosecuted this action on behalf of a class of black and Hispanic workers in the sheet metal construction industry. Defendants are Local 28 of the Sheet Metal Workers' International Association ("Local 28"), a labor union representing sheet metal workers in the greater New York area, and the Local 28 Joint Apprenticeship Committee ("the JAC"), a joint labor-management committee which oversees a four-year apprenticeship training program for novice sheet metal workers.

The apprenticeship program serves as the primary conduit into Local 28; approximately 80 percent of those who joined the union during the period relevant to this opinion were graduates of that program. The balance of new members (1) passed a battery of written and practical tests at the journeyman (skilled worker) level, (2) transferred from a "sister" local union, or (3) were employed as journeymen by a non-union metal shop at the time Local 28 organized the shop.

In 1975, after a three-week trial, Judge Werker found that both defendants had purposefully, consistently and egregiously discriminated against blacks and Hispanics in all four of the aforementioned admission procedures. *EEOC v. Local 638 ...*, 401 F.Supp. 467 (S.D.N.Y.1975) (Werker, J.).

1. A history of the litigation as a whole is reported in the following opinions and orders: *State Comm'n for Human Rights v. Farrell,* 43 Misc.2d 958, 252 N.Y.S.2d 649 (Sup.Ct.N.Y.County 1964); *State Comm'n for Human Rights v. Farrell,* 47 Misc.2d 244, 262 N.Y.S.2d 526 (Sup.Ct.N.Y. County), *aff'd,* 24 A.D.2d 128, 264 N.Y.S.2d 489 (1st Dep't 1965); *State Comm'n for Human Rights v. Farrell,* 47 Misc.2d 799, 263 N.Y.S.2d 250 (Sup.Ct.N.Y.County 1965); *State Comm'n for Human Rights v. Farrell,* 52 Misc.2d 936, 277 N.Y.S.2d 287 (Sup.Ct.N.Y.County), *aff'd,* 27 A.D. 2d 327, 278 N.Y.S.2d 982 (1st Dep't), *aff'd,* 19 N.Y.2d 974, 281 N.Y.S.2d 521, 228 N.E.2d 691

(1967); *United States v. Local 638 ... Local 28 of the Sheet Metal Workers' Int'l Ass'n,* 347 F.Supp. 164 (S.D.N.Y.1972) (Gurfein, J.); *EEOC v. Local 638 ...,* 401 F.Supp. 467 (S.D.N.Y.1975) (Werker, J.), *aff'd as modified,* 532 F.2d 821 (2d Cir.1976); *EEOC v. Local 638 ...,* 12 Fair Empl. Prac. Cas. (BNA) 733 (S.D.N.Y. Sept. 2, 1975) (Werker, J); *EEOC v. Local 638 ...,* 421 F.Supp. 603 (S.D.N.Y.1975) (Werker, J.); *EEOC v. Local 638 ...,* 565 F.2d 31 (2d Cir.1977); *EEOC v. Local 638 ...,* 753 F.2d 1172 (2d Cir.1985), *aff'd sub nom. Local 28 of the Sheet Metal Workers' Int'l Ass'n v. EEOC,* —— U.S. ——, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986).

**94**

The court held defendants in violation of Title VII as well as New York law, and it ordered, among a number of remedial measures, that defendants compensate the victims of their unlawful discrimination with backpay. *Id.* at 490–91. *See* 42 U.S.C. § 2000e–5(g).

Judge Werker imposed several limitations on the backpay remedy. Backpay claimants would be required to provide documentary evidence that they applied for direct admission to Local 28 based on either the journeyman-level tests or transfer from a sister union; that they were qualified for admission and were discriminatorily excluded; and that as a result they suffered monetary damages. Backpay would be denied to those who could provide only testimonial evidence of their application to Local 28, and to those who sought entrance to Local 28 through the apprenticeship program or as employees of a previously nonunion sheet metal shop, because Judge Werker thought such damages were too "hypothetical" and "speculative." 401 F.Supp. at 491.

The backpay remedy was also limited in time. Damages were to begin accruing on the date of discrimination against the claimant, but in no event for discriminatory acts occurring prior to July 2, 1965, the effective date of Title VII's backpay provision. 42 U.S.C. § 2000e–5(g). *See* Pub.L. No. 88–352, § 716. Damages would continue to accrue until the earlier of the date of the claimant's admission to Local 28 or July 18, 1975, the date of Judge Werker's decision. Moreover, any individual alleging entitlement to backpay was required to file a notice of claim with a court-appointed special master, the "administrator," on or before January 15, 1976.[2]

The Court of Appeals subsequently modified Judge Werker's backpay order and affirmed it as modified. *EEOC v. Local 638 ...*, 532 F.2d 821 (2d Cir.1976). The Court of Appeals noted that denial of backpay to claimants who cannot provide documentary evidence of their applications would have the perverse effect of rewarding Local 28 and the JAC for their record-keeping failures. Concluding that such a limitation would " 'frustrate the central statutory purposes' of Title VII," the Court of Appeals expanded the class of eligible claimants to include those who can show with either testimonial or written evidence that they were discriminatorily excluded from Local 28 or the apprenticeship program. *Id.* at 832–33 (quoting *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 421, 95 S.Ct. 2362, 2373, 45 L.Ed.2d 280 (1975)).

Pursuant to the backpay decision as modified by the Court of Appeals, the administrator, David Raff, Esq., thereafter promulgated rules for the adjudication of backpay claims. As amended and adopted by Judge Werker on October 6, 1977, the backpay rules reiterated, clarified, and in some respects modified the court's prior decision. They established four classes of black and Hispanic claimants: (1) those who had applied for direct admission into Local 28 (by taking the journeyman-level tests or by transfer from a sister local); (2) those who had applied for admission to the apprenticeship program; (3) those who had been employed in a shop organized by Local 400 of the Sheet Metal Workers' International Association, a predominantly nonwhite local, at a time when Local 28 refused to organize the shop; and (4) those employees of a nonunion shop to whom Local 28 had refused admission upon its organization of the shop. The rules also extended the period during which backpay might accrue from July 18, 1975 to October 11, 1975.

A small number of individual claims were settled or tried before the administrator and approved by Judge Werker. *Id.* at 832. The administrator found Local 28 liable to one claimant in particular, Charles Moss, and Judge Werker adopted the administrator's decision in its entirety on April 23, 1984. However, the administrator made no final determination of the amount of damages owing to Moss until April 16, 1987. The administrator's deter-

---

**2.** By a stipulation and order dated January 13, 1976, the time for filing notices of claim was extended to January 30, 1976.

mination will be considered in conjunction with the other backpay claims before the court.

After Judge Werker's death in May, 1984, the case was reassigned to me. In view of the substantial delay already occasioned in the determination of backpay claims—notwithstanding Judge Werker's adoption of rules to systematize the process—the parties were informed at a conference on November 6, 1987, that outstanding backpay claims would be adjudicated at a single hearing before the court rather than in multiple proceedings before the administrator. The parties conducted discovery during the months of November and December, 1986, and the court held a four-day hearing on damages on January 5–8, 1987.

At the hearing, defendants first moved to dismiss the backpay claims on various grounds. The court took the motion under advisement. The EEOC then presented the claims of 33 individuals.[3] Of the 33 claimants, the EEOC now concedes that nine suffered no damages, rendering them ineligible for backpay.[4] Thus, in addition to the appeal from the decision of the administrator awarding backpay to Charles Moss, 24 claims are now before the court.

### FINDINGS OF FACT

On the basis of the evidence presented at the hearing, the court renders the following findings of fact:

1. C. Nigel Allison attempted to transfer into Local 28 as journeyman in February, 1971. (Hearing Transcript ["Tr."] 425). He was qualified for transfer by virtue of thirteen years of experience in sheet metal work, including nine years as a journeyman in other unions. (Tr. 423–25). Indeed, when he later passed a journeyman-level examination, Local 28 refused to

offer him employment on the ground that he was *overqualified* for work as a journeyman. (Tr. 430). Local 28 did not subsequently offer work to Allison. (Tr. 431). Allison found alternative, lowerpaying work in the sheet metal trade throughout most of the backpay period. (Tr. 435–42). During periods of unemployment—July to October, 1973, May to December, 1974, and June to October, 1975—he actively searched in newspapers, by telephone, and in person for work in sheet metal shops as well as other businesses. (Tr. 440–42).

2. Raymond H. Brown applied for admission to Local 28 as a journeyman in 1969. (Tr. 51–52). He became qualified for admission as a journeyman no later than June, 1969, when, after joining the sister union Local 400 in 1962, he completed a sheet metal work apprenticeship program and attained journeyman status in Local 400. (Tr. 61). Local 28 initially denied Brown's request for a transfer from Local 400. On October 29, 1973, Local 28 issued a transfer card to Brown. (Tr. 72–73; Plaintiff's Exh. 32). However, even after receiving the transfer card, the employers for which Local 28 acted as bargaining agent refused to hire Brown. (Tr. 53–54, 81–82). After an extensive search for work, Brown left Local 28 and found alternative employment on his own. (Tr. 81–82).

3. Reginald Jones applied for transfer into Local 28 as a journeyman in October, 1968. (Tr. 239–41). He was qualified for transfer based on eight years of experience as a sheet metal worker and his admission as a journeyman into Local 400 earlier in 1968. (Tr. 238). Local 28 denied Jones's request for transfer and did not subsequently offer him admission. (Tr. 240–41). Jones continued with alternative, lowerpaying jobs throughout the backpay period (Tr. 257–60). Although his employment

3. The EEOC earlier undertook the representation of 66 backpay claimants. However, it apparently was unable to contact approximately 31 of the claimants, and in any event only 33 individuals were present at the hearing to testify and prosecute their claims. The claims of the 33 individuals who failed to appear were dismissed from the bench. Hearing Transcript at 743.

4. Those individuals who either failed to appear at the hearing or suffered no damages, and whose claims are therefore dismissed, are listed in the letter to the court from defendants' counsel, Edmund P. D'Elia, Esq., dated Feb. 27, 1987. *See also* Letter to the Court from Tanya C. Lewis, Esq., Mar. 6, 1987.

was part-time in 1973 and 1974, he sought additional work, without success, both inside and outside of the sheet metal trade. (Tr. 260–62).

4. John McLean first became employed as a sheet metal worker in Trinidad in 1957. (Tr. 622). He moved to the United States in 1968 and took a job at Interstate Sheet Metal ("Interstate"). (Tr. 624). In April, 1970, Interstate was organized as a Local 28 shop. (*Id.*) At that time, his supervisor at Interstate urged Local 28 to admit McLean as a journeyman. (Tr. 624–25). On the basis of these facts, McLean was qualified for admission. However, Local 28 refused to offer him membership and McLean was not offered employment in the newly organized shop, called Greenpoint Sheet Metal. (*Id.*) McLean thereafter diligently sought alternative employment in other sheet metal shops. (Tr. 633–35). Except for brief periods of unemployment, April to June, 1970, January to June, 1974, and September, 1975, he maintained continuous employment. (*Id.*).

5. William Saunders began working in the sheet metal trade in 1962 in Jamaica. (Tr. 264). He moved to the United States in 1970 and became an apprentice in Local 400 (Tr. 264–65). In 1971, he became a journeyman in Local 400 after successfully completing a course in sheet metal practice. (Tr. 265). In September, 1972, Saunders applied both to transfer from Local 400 and to take the journeyman-level entrance examination for admission to Local 28. (Tr. 265, 267–70). He submitted an application to the Recruitment and Training Program ("RTP") (an organization unaffiliated with defendants) and his application was forwarded to Local 28 immediately thereafter. (*See* Tr. 265–69). He was qualified for transfer into Local 28 based on his status as a journeyman in Local 400. He was also eligible to take the Local 28 entrance examination for journeymen. Local 28 neither offered Saunders admission to the union, nor allowed him to take the journeyman test, at any time during the backpay peri-

od. (Tr. 278, 291). Saunders maintained alternative, lower-paying employment throughout the backpay period. (Tr. 271–73).

6. Jessie Watkins applied on April 23, 1973, both to transfer and to take the journeyman test for admission to Local 28 as a journeyman. (Tr. 400–03; Plaintiff's Exhs. 171–72). He was qualified for a transfer on the basis of five-and-a-half years of experience as a sheet metal worker and his attainment in 1971 of journeyman status in Local 14 of the Sheet Metal Workers' International Association, a union in Burlington, Vermont. (Tr. 398, 401). He was also eligible to take the journeyman test. Although Local 28 interviewed Watkins on two occasions in or about August, 1973, the union refused to allow him to transfer or take the journeyman test. (Tr. 403–04). Watkins thereafter actively sought alternative employment first in New York City, and then in Vermont upon his return there. (Tr. 406–09). His efforts led to intermittent work in both locations. (*Id.*). He then enrolled at a university in Vermont and pursued part-time work in a work-study program through the end of the backpay period. (Tr. 409–10).

7. Henry Woods became a sheet metal worker in 1963. In 1965 he became an apprentice, and in 1969 a journeyman, in Local 400. (Tr. 26–27). Woods first applied for admission to Local 28 in 1967, and he attempted to take a journeyman test in or about April, 1968. (Tr. 28). He arrived at the testing site a few minutes after the announced start of the test while test papers were being distributed, but was turned away, purportedly because he was late. (*Id.*). The court finds that his exclusion from the testing site was not sufficiently job-related to rebut an inference of discrimination. Woods thereafter reapplied for admission to Local 28 and, upon passing the journeyman test in 1969, he became a member of the union on November 9, 1969.[5] (Tr. 29–30). However, even after

5. At the time this case was originally tried, Judge Werker also found that not long before the 1969 examination Local 28 discriminatorily denied Woods a transfer from Local 400 as a

journeyman. 401 F.Supp. at 486–87. In view of the prior discriminatory exclusion of Woods from the journeyman test, however, the union's

his admission to Local 28, he was not afforded employment opportunities at parity with other Local 28 members.

8. William Rhoe entered the sheet metal trade in 1969, when he was hired by Loris Air Industries ("Loris"). (Tr. 533). In 1971, Long Island City Sheet Metal ("LIC"), a Local 28 shop, acquired Loris, and the Loris employees thereafter worked at LIC's shop. (Tr. 533–34). A business manager for Local 28 held a meeting in or about August, 1971, to organize the Loris employees since, in Rhoe's words, "we were working in the same shop, doing the same jobs, using the same material, the same machinery, the same [e]quipment." (Tr. 535). Local 28 refused, however, to include the employees of Loris in the unionization. (*Id.*). Instead, the LIC shop was partitioned: those who had worked for LIC prior to the Loris acquisition remained employees of LIC and members of Local 28, (Tr. 537–39), while those who had worked for Loris, apparently most or all of whom were black or Hispanic, worked in the LIC building as employees of a nominally different, nonunionized company, Wynco Maintenance Corporation ("Wynco"). (*Id*). Rhoe worked at Wynco until October, 1973, when he was laid off. (Tr. 539–40). On the basis of these facts, Rhoe was qualified for membership in Local 28 when the union refused to admit him in August, 1971. However, because the EEOC failed to establish Rhoe's qualifications as a journeyman, the court must presume that he was qualified only as an apprentice. Local 28 did not subsequently admit Rhoe to its membership. After his lay-off, Rhoe attended the Burke Trade School. While in school he nevertheless applied and interviewed for sheet metal jobs at a number of shops. (Tr. 542–43, 550–51). Upon completing trade school, he opened his own business, which he continued to operate through the end of the backpay period. (Tr. 540).

9. Delmar Newby attempted to apply for a transfer into Local 28 as an apprentice in October, 1971. (Tr. 374–75). At the time, he was a sheet metal apprentice at Local 400, but had been laid off by his employer, Rotodyne. (Tr. 375). Newby was eligible for a transfer into Local 28 as an apprentice based on his corresponding status in Local 400. When he inquired at the offices of Local 28, however, his request for an application was denied, and he was not subsequently offered a transfer or afforded an opportunity to apply for one. (Tr. 375–76, 383–85). During the last few months of 1971, Newby sought but was unable to find alternative employment. (Tr. 376–77). In 1972, he moved back and forth between two sheet metal shops during a series of lay-offs. (Tr. 377–78). Without work during 1973 and most of 1974, Newby drew unemployment insurance benefits and unsuccessfully sought work. (Tr. 379–80). He found work in the latter part of 1974, however, and continued to work, first as a security guard and later in a paint company, through the end of the backpay period. (Tr. 379–80).

The following individuals (*see* ¶¶ 10–24, *infra*) applied for admission to defendants' apprenticeship program. All were excluded from the program by means of an apprentice test which has been found unlawfully discriminatory. *See* 401 F.Supp. at 477–81. In the cases of certain backpay claimants (*see* ¶¶ 10, 12–14, 17–20, 22–24, *infra*), the class of apprentices from which a claimant was excluded should have been indentured at the date indicated below, but was not indentured until a later date due to what has subsequently become a persistent pattern of improper underutilization of the apprenticeship program by defendants. *See, e.g., Local 28 . . . v. EEOC,* 478 U.S. 421, ——, 106 S.Ct. 3019, 3029 & n. 11, 92 L.Ed.2d 344 (1986).

10. Hippolito Bravo first applied for admission to the apprenticeship program in January, 1969, and took the entrance test in April, 1969. (Tr. 513). A class of apprentices who took the April, 1969, test should have been indentured into the program in July, 1969. (*See* Tr. 761). Bravo was denied admission to the program. (Tr. 514). Although Bravo took the entrance test again in October, 1971, he was not

denial of his request for a transfer is immaterial    to the determination of backpay.

subsequently admitted to the program. (Tr. 516). Bravo diligently sought and obtained alternative employment, first with the United States Navy and then with a private company, during those portions of the backpay period when he was not seeking admission to the apprenticeship program. (Tr. 515, 517, 524).

11. Peter Cooper applied for admission to the apprenticeship program in 1971 and took the entrance test in October, 1971. (Tr. 174, 761). A class of apprentices who took the test with him was indentured in January, 1972. (Tr. 761). Cooper received neither an offer of admission to the program nor any notification of his test results. (Tr. 175). Beginning in early 1972, Cooper actively sought alternative employment. (Tr. 182–87). For the first few months he had mixed success in his job search, but in August, 1972, he obtained employment at a city agency where he remained throughout the remainder of the backpay period. (Id.).

12. Leopaldo Garcia applied for admission to the apprenticeship program in or about early 1973, and he took the entrance test in March, 1973. (Tr. 333–34). A class of apprentices who took the test with him should have been indentured in July, 1973. (See Tr. 762). Garcia's application was denied. (Tr. 334). At the time he applied to the program, through early January, 1975, Garcia was employed as a mail clerk. (Tr. 336–37, 340). When he left that job, he actively sought other work, and he obtained full-time work three months later at a hospital. (Tr. 337–38).

13. Marshall Mason applied for admission to the apprenticeship program in January, 1969, and took the entrance exam in April, 1969. (Tr. 567–68). A class of apprentices who took the April, 1969, test should have been indentured in July, 1969. (See Tr. 761). Although Mason was notified that he had passed the test, defendants denied him admission to the program a few months later. (Tr. 568–69). Mason worked almost continuously during the backpay period, as a member of the United States Air Force and for a number of private employers. (Tr. 571–73). The one exception was the period from June, 1973, to January, 1974, when Mason was a full-time student at the Control Data Institute. (Tr. 572–75).

14. Gerard Moore applied for admission to the apprenticeship program in early 1973, and took the entrance test in March, 1973. (Tr. 363–64). A class of apprentices who took the test with him should have been indentured in July, 1973. (See Tr. 762). Moore's application was denied. (Id.). Moore worked on a full-time basis at a meat company throughout the backpay period. (Tr. 365–66).

15. Jose Muniz first applied for admission to the apprenticeship program in 1971, and took the entrance test in October of that year. (Tr. 482–83). A class of apprentices who took the October, 1971, test was indentured in January, 1972. (Tr. 761). Both in October, 1971, and upon his second application in March, 1973, defendants denied Muniz admission to the program. (Tr. 484, 493). Beginning in January, 1972, Muniz worked on a full-time basis for a manufacturing company. (Tr. 485). He was laid off, however, in October, 1972. (Id.). He thereafter collected unemployment insurance and searched for work in a variety of areas including the police department, the post office, health care agencies, and private industry. (Tr. 486–89). Although he obtained temporary employment from October through December, 1973, his job search was largely unsuccessful until May, 1974, when he found full-time work, lasting through the end of the backpay period, with another manufacturing company. (Tr. 487–89).

16. Arthur Myers first applied for admission to the apprenticeship program in June, 1968, and took the apprentice test in September or October, 1968. (Tr. 579–80, 760). A class of apprentices who took the entrance test in the autumn of 1968 was indentured in January, 1969. (Tr. 760–61). Although Myers reapplied and retook the test five different times during the years 1968 through 1974—and five times he passed the written and physical tests—he was never admitted to the program. Even while thus persistently attempting to gain admission to the apprenticeship program,

Myers worked for a number of employers throughout the backpay period. (Tr. 588–91). His only break from full-time work was a three-month period in late 1970, during which he attended a community college and attempted, albeit unsuccessfully, to find part-time work. (Tr. 588, 612–13).

17. Herbert Noisette applied for admission to the apprenticeship program in October, 1972, and took the entrance test in March, 1973. (Tr. 650–51). A class of apprentices who took the March, 1973, test should have been indentured in July, 1973. (*See* Tr. 762). Noisette was not admitted to the program. (Tr. 651–52). Noisette held full-time jobs in the New York City Parks Department and at the New York City Public Library during much of the backpay period. (Tr. 654). During his only significant period of unemployment, August, 1974, to August, 1975, he made diligent efforts to find employment, including searches through newspaper listings and at employment agencies in both New York City and Washington, D.C. (Tr. 654–57). Starting in August, 1975, and continuing through the end of the backpay period, Noisette was enrolled in a union-approved training program teaching skills applicable to work in machine shops. (Tr. 655, 658).

18. Calvin L. Norris applied for admission to the apprenticeship program in late 1972 or early 1973, and took the entrance test in March, 1973. (Tr. 310–12). A class of apprentices who took the test with him should have been indentured in July, 1973. (*See* Tr. 762). Defendants did not admit Norris to the program. (Tr. 312). Norris worked for the United Parcel Service throughout the backpay period. (Tr. 313–14). Although that work was part-time, he also sought supplementary employment with, and passed tests for, the New York City Departments of Sanitation and Housing Maintenance. (Tr. 318–22).

19. Louis Pabon applied for admission to the apprenticeship program in October, 1972, and took the entrance test in March, 1973. (Tr. 293–94). A class of apprentices who took the test with him should have been indentured in July, 1973. (*See* Tr. 762). Pabon was not admitted to the pro-

gram. (*See* Tr. 295–96). Pabon was employed on a full-time basis during the backpay period except for a brief period of lay-off and during the months April through November, 1974, when he held various part-time jobs or was unemployed. (Tr. 296–98, 300–01). During this eight-month hiatus, he searched through newspaper job listings and applied directly to various airlines for work as a mechanic, and by November, 1974, he was successful in this search. (Tr. 300–02).

20. Robert L. Ramos applied for admission to the apprenticeship program in the autumn of 1972, and took the entrance test in March, 1973. (Tr. 159–60). A class of apprentices who took the test with him should have been indentured in July, 1973. (*See* Tr. 762). Ramos was not accepted into the program. (Tr. 160). Ramos was a full-time student at Lehman College throughout the backpay period. (Tr. 166). He also worked on a part-time basis at a department store during the period July, 1973, through October, 1974. (Tr. 165).

21. Hector Santini applied for admission to the apprenticeship program in 1971, and took the entrance test in October of that year. (Tr. 127–28). A class of apprentices who took the test with him was indentured in January, 1972. (Tr. 761). Santini was not admitted to the program. (Tr. 129). During the first two months of 1972, Santini worked for the New York City Police Department. (Tr. 131). From March, 1972, to September, 1973, he was unemployed and received unemployment insurance benefits. (Tr. 134; Plaintiff's Exh. 127). In or about October, 1973, he enrolled in a five-month course at a trade school in air conditioning and refrigeration, which he attended on a full-time basis. (Tr. 137). Upon completion of the course, Santini actively sought work by word-of-mouth both directly and with his school's assistance. (Tr. 137–41). With the advent of the summer months, in or about May, 1974, he began full-time work at Polar Distributors. (Tr. 139). He remained there until August or September, 1974, when he was laid off due to the seasonal nature of the work. (Tr. 142–43). He then sought other work through an unemployment agency, without

success, but resumed steady work with Polar Distributors from February or March, 1975, through the remainder of the backpay period. (Tr. 143–46).

22. Richard White applied for admission to the apprenticeship program and took the entrance test in March, 1973. (Tr. 666–67). A class of apprentices who took the test with him should have been indentured in July, 1973. (*See* Tr. 762). Although White passed the written test he failed a subsequent oral interview and was not admitted to the program. (Tr. 668–70). Except for a brief period between jobs, White had full-time work from July, 1973, through February, 1975. (Tr. 671–72). During the remainder of the backpay period, he received unemployment insurance benefits and searched for work through friends, numerous employment agencies, newspaper listings, and the Recruitment and Training Program. (Tr. 673–75).

23. David Willis applied for admission to the apprenticeship program and took the entrance test in March, 1973. (Tr. 682). A class of apprentices who took the test with him should have been indentured in July, 1973. (*See* Tr. 762). Willis was not offered admission to the program. (Tr. 683). Willis was unemployed during the period July, 1973, to October, 1974, but actively sought work through various employment agencies by applying directly to employers. (Tr. 686–87). From October, 1974, through the end of the backpay period, he worked for the Federal Reserve Bank of New York, for the first few months on a part-time basis and then full-time. (Tr. 684–85).

24. Harold Wright applied for admission to the apprenticeship program in 1972 and took the entrance test in March, 1973. (Tr. 221–22; *see* Tr. 762). A class of apprentices who took the test with him should have been indentured in July, 1973. (*See* Tr. 762). Wright was not admitted to the program. (Tr. 222–23). Wright worked on a full-time basis throughout the backpay period, except for a three-month period in late 1973 or early 1974. (Tr. 230–31). During that period, he applied for work with a variety of employers, including department stores and city agencies, he took a test for

work at the New York City Transit Authority, and he eventually was successful in finding work at Columbia Presbyterian Hospital. (Tr. 228, 230, 234–36).

All of the backpay claimants are black or Hispanic. The average wages and fringe benefits earned by Local 28 journeymen and apprentices, respectively, for the period July 2, 1965, through October 11, 1975, are listed in Plaintiff's Exhibits 203 and 204.

## DISCUSSION

As noted above defendants have moved to dismiss the backpay claims, and they raise a variety of arguments in support of their motion. They contend first that the backpay claims already have been settled out of court. They assert that they made a firm offer of settlement in the amount of $95,000. They further note that in a Memorandum and Order dated March 18, 1983, the administrator reported that the EEOC had secured agreement to the terms of the settlement from all 66 of the claimants that it had undertaken to represent, out of a total of 96 identified potential claimants. From these facts defendants infer that an oral settlement agreement was reached and is now binding on the parties.

■ The inference is incorrect. A *final*, oral settlement agreement, like other oral contracts, may well be valid and binding. *Fulgence v. J. Ray McDermott & Co.*, 662 F.2d 1207, 1209 (5th Cir.1981) (per curiam). In this case, however, no final agreement was reached, much less formalized. Because this action is prosecuted on behalf of a class of individuals, the court's approval was a prerequisite to any settlement. F.R. Civ.P. 23(e). As the administrator stated at the hearing, neither he nor Judge Werker approved defendants' settlement offer, and in fact the parties never filed a motion for approval. (Tr. 22). Notice and an opportunity to object were apparently not provided to the entire class of potential claimants. (*Id.*). In fact, defendants themselves rejected the EEOC's offer to settle on behalf of 66 claimants since their liability to the remaining 30 class/members would have remained unresolved. In sum,

none of the conditions for court-approved settlement was met.

██ Defendants next argue that plaintiff's "essentric [sic] and improper conduct in prosecuting" the backpay claims itself warrants dismissal. Defendants' Notice of Motion, December 19, 1986, at 1. They explain that delay in adjudication of the claims has substantially prejudiced them inasmuch as potential witnesses have died or their memories have faded, documents have been destroyed, and interest on the backpay claims has accrued.

The delay in the resolution of the backpay claims undeniably has been extensive. For that matter, delays in the resolution of this case as a whole, including numerous issues entirely apart from backpay, have been extraordinary.[6] Defendants have failed to persuade the court, however, either that the delay has been inexcusable or that the EEOC should shoulder the blame for it. Certainly, some of the delay has simply been the result of administrative difficulties incident to the reassignment of the case during the pendency of defendants' appeal of various orders to the Court of Appeals and the United States Supreme Court. In particular, administrative delay led the court to consolidate the backpay claims after the existing procedures had proven unwieldy.

Delay in the parties' attempts to agree upon and finalize a settlement similarly was substantial. As defendants note, plaintiff requested and the administrator granted a number of stays in the backpay proceedings pending notification of and assent by the class members. The EEOC probably could have done a better job in coordinating its outreach efforts. However, defendants have presented nothing from which to infer that the EEOC acted in bad faith, or that delay which it alone caused was so "inordinate" as to require dismissal of the claims. *See Occidental Life Insurance Co. of California v. EEOC,* 432 U.S. 355, 373, 97 S.Ct. 2447, 2458, 53 L.Ed.2d 402 (1977).

██ Oddly enough, even while arguing that plaintiff inexcusably delayed prosecution of the claims, defendants also argue that their opportunity to conduct discovery was prejudicially inadequate. Yet the backpay rules as originally promulgated on August 20, 1976, and as amended and adopted by Judge Werker on October 6, 1977, made explicit provision for discovery as well as resolution of discovery disputes before the administrator.[7] Defendants concede that the parties undertook some discovery pursuant to the backpay rules. Necessarily, they imply that discovery was never completed for most of the claimants, but they offer no excuse for this failure. After a decade of at least partial inaction by defendants, their complaint that this court cut short the discovery process rings hollow. In fact, the court allowed expedited discovery during the month before the hearing into matters relevant to the backpay claims. Defendants' discovery demands beyond that accommodation were properly denied in terms of both their right to information before the hearing and plaintiff's right to be free from harrassment. *See, e.g., Dolgow v. Anderson,* 53 F.R.D. 661, 664 (E.D.N.Y.1971).

██ Defendants also attempt to invoke Judge Werker's January 30, 1976, deadline

---

**6.** For example, a stipulation and order was entered on August 27, 1987, extending to August 31, 1992, defendants' time for achieving desegregation in Local 28 in compliance with Judge Werker's July 18, 1975 opinion. 401 F.Supp. 467. Assuming that the 1992 goal is met, approximately 30 years will have passed from the time this litigation began in the New York state courts.

**7.** The amended backpay rule on discovery states:

> All parties will be allowed a reasonable period for discovery of evidence pertinent to the claims. To the extent practicable, this discovery shall be conducted informally and all parties shall cooperate fully with all reasonable and relevant discovery. Defendants shall provide meaningful access (including interpretive assistant [sic] where appropriate) to pertinent documents and records. If disagreements should arise with respect to discovery the Administrator is available, upon reasonable notice, to resolve those differences.

Amended Order Establishing Rules for Back Pay Claims, ¶ 6(a).

for filing notices of claim, *see* note 2 *supra*, and argue that the court should dismiss the claims of the individuals who did not comply with the deadline. The EEOC admits that C. Nigel Allison filed a notice of claim on February 20, 1976, and that it has no record of a filing by Raymond H. Brown or William Saunders.

Defendants' reliance on the January 30, 1976, deadline is misplaced. The notice-of-claim requirement did not create a condition of jurisdiction or an enforceable right for defendants. Rather, Judge Werker no doubt felt it appropriate to set the requirement to facilitate the management of his docket in general and the orderly hearing of the backpay claims in particular. The posture of this case a decade later has rendered these concerns beside the point. A class of 96 potential claimants—including Allison, Brown, and Saunders—has long since been identified. As plaintiff notes, the three individuals in question are original parties to this action. Defendants thus have had *de facto* if not *de jure* notice of their claims thoughout the long life of this case. If any doubt remained as to which claims would be prosecuted at the hearing, the court eliminated it by directing the EEOC to produce the names of the individuals whose claims it would pursue; and the EEOC did so on December 5, 1986. This direction to identify the claims in controversy effectively superseded Judge Werker's notice-of-claim requirement.[8]

Defendants next argue in support of dismissal of the claims that, contrary to the findings of fact set forth in this opinion, all of the claimants were unqualified for admission to the union. Defendants assert that the claimants who applied for transfer into Local 28 were not qualified because they lacked five years' membership in a sister local as required by Local 28's constitution.[9] Those who applied to become apprentices, according to defendants, did not achieve sufficiently high scores on the "mechanical comprehension" component of the entrance exam—the sole component which Judge Werker found job-related.

■ Both challenges to the claimants' qualifications are without merit. The fundamental issue which defendants' assertions raise is whether, notwithstanding the *prima facie* case of discrimination which each of the backpay claimants individually has established, denial of membership to the claimants was legitimately the result of a lack of job-related qualifications. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed. 2d 668 (1973). In the case of applicants for transfer, defendants failed to come forth with any evidence that the five-year requirement ever played a part in the denial of their applications. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254–55 & n. 9, 101 S.Ct. 1089, 1094 n. 9, 67 L.Ed.2d 207 (1981) ("[D]efendant must clearly set forth, through the introduction of admissible evidence, the reasons for the [claimant's] rejection. An articulation not admitted into evidence will not suffice. Thus, the defendant cannot meet its burden merely ... by argument of counsel."); *McDonnell Douglas Corp., supra*, 411 U.S. at 802, 93 S.Ct. at 1824.

Similarly, the burden is on defendants to demonstrate that their rejection of applicants to the apprenticeship program rested on job-related criteria. Again, defendants have failed to carry their burden. Admission to the program was governed by the ranking of applicants according to their overall scores on the entrance examination.

---

**8.** For these same reasons, the court rejects defendants' argument that backpay should be denied to those claimants who were not identified to the EEOC on or before September 30, 1982.

**9.** Two other journeymen claimants, John McLean and William Rhoe, are said to be ineligible for backpay on the ground that there is no evidence that they were qualified for Local 28 membership when the union organized the shop for which they were working. The simple an-

swer is that such evidence was indeed presented.

In addition, defendants contend that Delmar Newby was ineligible for transfer as an apprentice based on his age of 44. To seek entry to the apprenticeship program *from the start*, applicants were required to be no older than 30 years of age. 401 F.Supp. at 475. Newby was an applicant for transfer, however, and the age limit for starting apprentices is not properly applied to him.

(*See, e.g.,* Plaintiff's Exhs. 196, 207; Defendants' Exhs. V & W). The Court of Appeals, however, agreed with Judge Werker that defendants' expert testimony at the 1975 trial was "clearly insufficient to sustain the union's claim of job-relatedness" as to that exam. *EEOC v. Local 638 ... Local 28 of the Sheet Metal Workers' Int'l Ass'n,* 532 F.2d at 826, *aff'g* 401 F.Supp. 467 (enjoining continued use of exam). Defendants have made no showing that any claimant was rejected on the basis of his score on the "mechanical comprehension" component of the exam, or that applicants were separately ranked according to their scores on that component. Having administered an exam which "as a whole is [not] significantly job-related," 401 F.Supp. at 480, defendants are in no position now to contend that these claimants *would* have proven unqualified had they been tested fairly.

■ Defendants nonetheless argue that the law of the case compels such an outcome. It is true that the backpay rules promulgated by the administrator set, as a prerequisite for backpay, "a sufficient score [on the mechanical comprehension component for the applicant] to be among the class of persons accepted into the apprenticeship program." Amended Order Establishing Rules for Back Pay Claims, ¶ 1(b). "Law of the case" doctrine does not, however, foreclose the "self-correction of judicial error," *EEOC v. Local 638 ... Local 28 of the Sheet Metal Workers' Int'l Ass'n,* 565 F.2d 31, 37 (2d Cir.1977) (Meskill, J., dissenting) (quotation omitted); *see Messenger v. Anderson,* 225 U.S. 436, 444, 32 S.Ct. 739, 740, 56 L.Ed. 1152 (1912). The requirement of a "sufficient score" on the mechanical comprehension test is an instance of clear judicial error which requires correction. Judge Werker himself recognized that there was "no cut-off pass/fail score for the entrance exam." 401 F.Supp. at 475 (Finding no. 23). Perforce there was no fixed passing score for the "mechanical comprehension" component taken by itself.

■ Defendants next advance several arguments aimed at denial of at least some backpay to the claimants. They point out that the backpay rules have provided that backpay for journeymen begins to accrue "on the date on which the next applicant for admission who does not qualify as a non-white ... is admitted to the union." Amended Order Establishing Rules for Back Pay Claims, ¶ 2; 401 F.Supp. at 491 n. 34. That standard undoubtedly would be appropriate were the court able to assume that Local 28 regularly and promptly admitted whites to the vacancies created by their discriminatory exclusion of nonwhites, and that they kept a record of this hiring.

From the vantage point of hindsight, however, such assumptions are not now warranted. Defendants' discriminatory conduct has formed a pattern of underutilization of the apprenticeship program, the primary avenue to union membership, and there is nothing to suggest that other avenues were not closed off to blacks and Hispanics without relation to employer need. *See* 478 U.S. at ——, 106 S.Ct. at 3026–27, 3029 & n. 11. More significantly, even if Local 28 ever acted promptly to place whites in job positions that should have been filled by nonwhites, their longstanding pattern of record-keeping failures very likely precludes ascertainment of when they did so. *Id.* at ——, 106 S.Ct. at 3029 & n. 13. In short, their unlawful conduct has rendered unworkable Judge Werker's standard for accrual of journeyman's backpay. Such circumstances compel resolution of uncertainties against Local 28, the discriminating party, *see EEOC v. Enterprise Ass'n Steamfitters Local No. 638,* 542 F.2d 579, 587 (2d Cir.1976), *cert. denied,* 430 U.S. 911, 97 S.Ct. 1186, 51 L.Ed.2d 588 (1977), and the ascertainable date of application to the union accordingly governs, absent other facts indicating more precisely when discrimination against the claimant occurred.

■ Defendants also contend that four claimants, C. Nigel Allison, John McLean, Reginald Jones, and William Saunders, are ineligible for backpay because, it is alleged, they were undocumented aliens and must be deemed to have been "unavailable" for

work during the backpay period. *See Sure–Tan, Inc. v. NLRB,* 467 U.S. 883, 903, 104 S.Ct. 2803, 2814, 81 L.Ed.2d 732 (1984). In cross-examining the four claimants, defendants' counsel sought to substantiate these allegations. That line of cross-examination was halted, however, and defendants' attempt to raise the issue of alienage is now similarly rejected, because the issue is not properly before the court: "[P]rivate persons such as [defendants] have no judicially cognizable interest in procuring enforcement of the immigration laws by the [Immigration and Naturalization Service]." *Id.* at 897, 104 S.Ct. at 2811. The rights at issue here, which are not merely "cognizable" but compelling, are those of the victims of past discrimination to "make whole" relief. *See Albemarle Paper Co. v. Moody,* 422 U.S. 405, 421, 95 S.Ct. 2362, 2373, 45 L.Ed.2d 280 (1975).

Defendants also contend that the claimants failed to mitigate damages and thus should not be awarded backpay. For most of the individuals, this argument is difficult to take seriously: It is simply contrary to the facts the court has found. However, one legal issue warrants some discussion. Did those claimants who joined this country's *armed forces or enrolled in school* remove themselves from the job market and thereby fail to mitigate damages?

■ The answer is clear for those who became members of the armed forces. Having been denied admission to Local 28, the claimants found alternative employment in the military. Finding alternative work can hardly be called removing oneself from the job market. Membership in the armed forces is, moreover, not simply a job like any other: those who joined were performing a vital public service. *A fortiori,* it would be perverse to penalize them with an abatement of backpay for the income they forewent during their tours of duty. Nor does *NLRB v. Revlon Products Corp.,* 144 F.2d 88, 90 (2d Cir.1944), require a contrary result. The Supreme Court has only recently reiterated that "Principles developed under the National Labor Relations Act 'guide, but do not bind, courts tailoring

remedies under Title VII'." *Local 28 ... v. EEOC, supra* 478 U.S. at ——, 106 S.Ct. at 3035 n. 26 (quoting *Ford Motor Co. v. EEOC,* 458 U.S. 219, 226 n. 8, 102 S.Ct. 3057, 3062 n. 8, 73 L.Ed.2d 721 (1982)).

■ For claimants who attended school during the backpay period, the question is a closer one. An individual who abandons his willingness to search for and return to work and opts to attend school instead generally does not meet his duty to mitigate damages during the time he is in school. *See Taylor v. Safeway Stores, Inc.,* 524 F.2d 263, 267–68 (10th Cir.1975); *United States v. Wood, Wire & Metal Lathers International Union, Local Union 46,* 328 F.Supp. 429, 444 (S.D.N.Y.1971) (Frankel, J). On the other hand, one who chooses to attend school only when diligent efforts to find work prove fruitless, or who continues to search for work even while enrolled in school, does meet the duty. *See Smith v. American Service Co.,* 796 F.2d 1430, 1432 (11th Cir.1986); *Brady v. Thurston Motor Lines, Inc.,* 753 F.2d 1269, 1274 (4th Cir.1985); *Hanna v. American Motors Corp.,* 724 F.2d 1300, 1307–09 (7th Cir. 1984). In short, the central question is whether an individual's furtherance of his education is inconsistent with his responsibility "to use reasonable diligence in finding other suitable employment." *Ford Motor Co. v. EEOC,* 458 U.S. 219, 231, 102 S.Ct. 3057, 3065, 73 L.Ed.2d 721 (1982).

■ The burden of proving each claimant's failure to exercise reasonable diligence is on defendants. *Smith, supra,* 796 F.2d at 1431; *Brady, supra,* 753 F.2d at 1274. Defendants have failed to meet their burden here. Apparently, all of the claimants who attended school did so as a means not to abandon the job market but, on the contrary, to acquire marketable skills and thus to *enter* a labor pool. William Rhoe's study at a trade school enabled him to open his own business. Hector Santini attended a trade school in air conditioning and refrigeration and proceeded to apply those skills in his subsequent employment. Rhoe, Jessie Watkins, and Robert Ramos worked on a part-time basis during some or all of their time in school. Ramos

and Peter Cooper applied to Local 28's apprenticeship program while in college and defendants presented no evidence that, had they not been discriminatorily excluded from Local 28, they would have been unwilling to leave school. Rhoe and Arthur Myers actively sought additional work while they attended classes. Defendants failed, on the other hand, to produce evidence that *any* of these claimants received and rejected an offer of admission to Local 28, its apprenticeship program, or some comparable union or its training program. *See Ford Motor Co., supra,* 458 U.S. at 231–32, 102 S.Ct. at 3065–66. Their request that the claimants be denied backpay based on a failure to mitigate damages is therefore denied.

■ Defendants additionally contend that the backpay period for two claimants, Raymond H. Brown and Henry Woods, should have been tolled immediately upon their admission to Local 28. The argument has superficial appeal because Judge Werker's initial decision, read literally, sets the claimant's admission to the union as one criterion for termination of the backpay period. 401 F.Supp. at 491. Plaintiff has proceeded to prove, however, that the discrimination against Woods and Brown did not cease upon their admission to Local 28. Woods was unable to find work except at substantially lower wages than those of other union members. Brown could find virtually no work at all. In sum, Woods and Brown were Local 28 members in name only. The union afforded them none of the actual benefits of membership that would justify setting a cap on their damages as of the date of their admission. Thus, backpay for Woods and Brown continues to accrue through October 11, 1975, as though they had not been admitted to the union. *See Enterprise Ass'n Steamfitters, supra,* 542 F.2d at 590 ("date of actual remedying of discrimination ... should govern").

■ Defendants' next argument raises the question of what prejudgment interest rate is applicable to backpay awards. The backpay rules promulgated by the administrator provide for an interest rate of six percent per annum. Amended Order Establishing Rules for Back Pay Claims, ¶ 5(i). Defendants again invoke "law of the case" doctrine in support of their position that the six-percent rate should remain in effect.

The argument lacks merit because defendants' interpretation of the interest-rate provision in the backpay rules is excessively literal. Judge Werker made clear in a memorandum decision subsequent to his adoption of the amended backpay rules that the six-percent rate was based on "the current legal rate of interest on money judgments in the state of New York" and, equivalently, "the interest that attaches to a federal judgment under 28 U.S.C. § 1961 which sets the post-judgment rate of interest as that presently prevailing in the forum state." Memorandum, No. 71 Civ. 2877, slip op. at 2–3 (S.D.N.Y. Jan. 24, 1979) (Werker, J.) (citing CPLR § 5004 (McKinney Supp.1977–78)). Those two sources of authority, rather than anything special about the rate of six percent, were the determinants of the interest rate.

Both statutes have since been amended, and the law of the case should correspondingly be modified. *See System Federation No. 91 Railway Employees' Dept. v. Wright,* 364 U.S. 642, 646–48, 81 S.Ct. 368, 370–71, 5 L.Ed.2d 349 (1961). Under New York law, effective June 25, 1981, post-judgment interest is to be computed at nine percent per annum. NYCPLR § 5004; *see* 1981 N.Y. Laws, ch. 258, § 2. That is, interest is to accrue at six percent prior to June 25, 1981, and at nine percent thereafter. Under federal law, effective October 1, 1982, interest on a money judgment recovered in a civil case in a district court is to be calculated:

> at a rate equal to the coupon issue yield equivalent (as determined by the Secretary of the Treasury) of the average accepted auction price for the last auction of fifty-two week United States Treasury bills settled immediately prior to the date of the judgment.

28 U.S.C. § 1961(a); *see* Pub.L. No. 97–258, § 2(m).

Taking these statutes as guides, as Judge Werker did, prejudgment interest is

to be calculated at six percent compounded annually prior to June 25, 1981, at nine percent compounded annually from June 25, 1982, through September 30, 1982, and at the rate provided by 28 U.S.C. § 1961(a), compounded annually, from October 1, 1982, through the date of payment. *See* 28 U.S.C. §§ 1961(a), 1961(b); NYCPLR § 5004.

The court nonetheless takes seriously defendants' intimation that liability for a large award of interest could have debilitating financial consequences for them. The court agrees with these statements by Judge Werker in a letter of April 22, 1976, to the administrator:

> I think that economic problems are involved in this situation. I am not in the position where I wish to ruin Local 28 or J.A.C..... [I]t seems to me that you could very well destroy Local 28 and J.A.C. from an economic standpoint. It is my intention to retain a viable Local 28 and J.A.C. with a proper integration of black[s] and Hispanics.

Defendants' ability to bear liability for the backpay awards and interest without substantially and permanently impairing their day-to-day operations was not an issue addressed at the hearing in January of this year, but should now be considered. The matter shall be heard by the administrator immediately, and because the financial condition of defendants is the sole issue to be addressed, the hearing should conclude as quickly as possible. If, upon review of the administrator's findings, it appears that the interest ordered herein would impose an undue burden on defendants, the court may exercise its discretion in the awarding of backpay and reduce the interest award ac-

cordingly. *See Albermarle Paper Co., supra,* 422 U.S. at 415–16, 95 S.Ct. at 2370–71; *cf. Enterprise Ass'n Steamfitters, supra,* 542 F.2d at 592.

Inasmuch as the administrator's decision in the matter of the backpay claim of Charles Moss, dated April 16, 1987, is not inconsistent with the facts and law set forth in this opinion, the decision is now affirmed and adopted in its entirety by the court.

The backpay periods for the claimants, as reflected in the court's findings of fact and the administrator's April 17, 1987, decision, are tabulated in the Appendix. Plaintiff is directed to submit revised calculations of the backpay and interest owing to the claimants, consistent with the findings of fact and conclusions of law set forth herein, within two weeks of the filing of this opinion.[10] Defendants may file an opposition within one week thereafter.

The administrator is directed to schedule and conduct a hearing forthwith on the issue of defendants' financial capacity to pay interest on the backpay awards at the rates set forth in this opinion. Plaintiff is directed to submit its revised calculations, and defendants may present their opposition to plaintiff's calculations, in advance of the hearing. On the basis of the evidence presented at the hearing, the administrator is to recommend to what extent, if any, the interest on the backpay awards should be reduced. Upon consideration of the parties' calculations and the administrator's report and recommendation, final awards of backpay will be entered.

IT IS SO ORDERED.

---

**10.** Plaintiff is admonished that extension of the backpay period and other avoidable imprecision under the guise of "rounding off" will not be permitted.