Lazer Spot, Inc., : 
                                Petitioner : 
                    v. : 
                    : 
Pennsylvania Human Relations : 
Commission, : No. 459 C.D. 2017
                    Respondent : Argued: December 7, 2017


BEFORE:    HONORABLE ROBERT SIMPSON, Judge
           HONORABLE ANNE E. COVEY, Judge
           HONORABLE DAN PELLEGRINI, Senior Judge


OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE COVEY                         FILED: February 2, 2018


Lazer Spot, Inc. (Lazer Spot) petitions this Court for review of the Pennsylvania Human Relations Commission's (PHRC) March 27, 2017 Final Order directing Lazer Spot, *inter alia*, to cease and desist denying reasonable accommodations to employees with disabilities and terminating employees' employment because of their disabilities; to pay Matthew A. Harrison (Harrison) $104,364.23 plus additional interest of 6% per annum from February 7, 2013 until payment is made; to reimburse Harrison $10,880.00 for costs incurred pursuing his claim; and to offer to reinstate Harrison as a yard jockey.[1]  Lazer Spot presents four

---

[1] The PHRC further directed that if Harrison's gross earnings from September 2016 to March 27, 2017 were less than what Harrison would have made as a Lazer Spot employee, Lazer Spot is to pay Harrison the difference; unless and until Lazer Spot reinstates Harrison, Lazer Spot is to continue to pay the difference between what Harrison is currently earning and what Harrison would make as a Lazer Spot employee; if Harrison declines Lazer Spot's offer of reinstatement, all front pay obligations cease; if Lazer Spot fails to reinstate Harrison during the two-year period following March 27, 2017, Harrison shall make diligent efforts to find comparable work; and within thirty days of the effective date of the PHRC's order, Lazer Spot shall report to the PHRC on the manner of its compliance with the terms of its order.

issues for this Court's review: (1) whether Harrison has a non-job-related handicap or disability; (2) whether Harrison was capable of driving an 18-wheeled tractor-trailer over public roads without an accommodation; (3) whether participation in cross-training that involved driving an 18-wheeled tractor-trailer over public roads or being subject to temporary shuttle work assignments are essential functions of Lazer Spot's driver position; and, (4) whether Harrison mitigated his damages when he attended the York Technical Institute (YTI) and did not look for work during that time period.

On May 18, 2011, after seeing an internet advertisement specifically seeking to fill a yard jockey position with Lazer Spot, Harrison submitted a job application. Harrison interviewed with the Carlisle Area Manager Richard Klinger (Klinger), and was informed that, as advertised, yard jockey was the available position. When told he needed a Class A Commercial Driver's License (CDL) and a Pennsylvania Department of Transportation (DOT) medical card, Harrison showed the requisite documentation. Lazer Spot hired Harrison on June 3, 2011.

When Harrison completed Lazer Spot's Post-Hire Questionnaire (Questionnaire), Harrison indicated that he never had a disability outside those specified on the Questionnaire, but did reveal he had experienced a neck injury and surgery in 2005, knee surgery in 1989 and shoulder surgery in 1985. In response to the question that asked whether he ever had a mental condition, Harrison responded no. At this point, Harrison had not yet been diagnosed with Post Traumatic Stress Disorder (PTSD). Subsequent to being hired, Klinger tested Harrison's skills driving a yard jockey tractor (Ottawa) in one of Lazer Spot's customer's lot, Reckett Benckiser. During this driving test, Harrison was not asked to drive out of Reckett Benckiser's lot and, despite that the test was conducted entirely within Reckett Benckiser's lot area, Klinger checked off a number of items relating to Harrison's performance competency on a public road even though the items checked had not been tested.

Harrison's first assignment was as a yard jockey[2] at Reckett Benckiser, where he moved trailers from a ready-line to Reckett Benckiser's dock and back. The Reckett Benckiser site required the yard jockeys to drive the Ottawa[3] and trailers a short distance off-site to turn around. Harrison worked at the Reckett Benckiser location for approximately four to five months, before he asked Klinger to transfer him to the customer Americold's site. The effective date of Harrison's transfer to Americold was February 6, 2012. At Americold, Harrison strictly moved trailers with an Ottawa tractor from a ready-line to the customer's dock and back within Americold's fenced area. He did not perform shuttle work.[4]

While at both Reckett Benckiser and Americold, Harrison was a safe driver and performed well. In a September 2011 evaluation, his supervisor noted that Harrison was very helpful and that he would make a good lead. Harrison's September 2011 evaluation also indicated that he had been cross-trained at three to four sites. At that point, Harrison had already cross-trained at Reckett Benckiser, Caterpillar and Americold. Klinger testified that, in 2011, the purpose of cross-training was to benefit employees. Klinger also reported that, prior to 2013, cross-training had only occasionally been done in the Carlisle area, and that Klinger kept informal records of which employees could be sent to other locations when substitutes were needed.

In the fall of 2012, Harrison attended a meeting with Klinger, Lazer Spot's North East Regional Manager David Mumbauer (Mumbauer), and Lazer Spot's North East Regional Vice President of Operations Jerry Edwards (Edwards), during which cross-training was discussed, including cross-training spotters to

---

[2] A yard jockey is a term used to describe employees that work within a yard. *See* Reproduced Record at 412a.

[3] An Ottawa is a truck used for jockeying services. *See* Reproduced Record at 415a.

[4] Shuttling is moving product from one warehouse to another. *See* Reproduced Record at 404a.

shuttle. At the meeting, Harrison revealed that he would not be able to shuttle with an 18-wheeled tractor-trailer due to difficulties he has with PTSD and that he would not endanger the lives of others or himself because of his PTSD. Given Harrison's request that he not be assigned driving over the public roads with an 18-wheeled tractor-trailer, Mumbauer informed Harrison that he could cross-train at Reckett Benckiser. Mumbauer told Harrison that his issue was not a problem, and that they can work with him. Mumbauer agreed that it was possible to cross-train Harrison in a way that did not require him to operate an 18-wheeled tractor-trailer over the public roads.

In February 2013, another meeting was held at which Harrison, Mumbauer, Edwards and Klinger attended. The subject of the meeting was again cross-training that included shuttle driving and that the prior arrangement with Harrison had changed. Again, Harrison expressed concern about driving an 18-wheeled tractor-trailer over the public roads and refused to do so. Harrison asked to be permitted to continue cross-training without driving an 18-wheeled tractor-trailer over the public roads. Klinger told Harrison that he would have to drive over the public roads or be fired. Klinger then gave Harrison Lazer Spot's General Counsel Rhonda Wilcox-McCurtain's (Wilcox-McCurtain) telephone number and told Harrison to call her.

Harrison called Wilcox-McCurtain and told her about his PTSD symptoms and why they prevented him from driving an 18-wheeled tractor-trailer over the public roads. During the conversation, Harrison relayed that Lazer Spot had accommodated his PTSD since the fall of 2012. Wilcox-McCurtain informed Harrison that if he would not perform the assigned job, Lazer Spot would deem him to have resigned from his employment. Harrison responded that he would not quit, to which Wilcox-McCurtain replied, then it could be called an employment termination.

4

When Harrison informed Wilcox-McCurtain that he would report to work, she replied that he cannot because he does not work there any longer.

Wilcox-McCurtain, Edwards and Lazer Spot's Safety Vice President Mark Clayton held a conference call and decided to terminate Harrison's employment. During the conference call, Wilcox-McCurtain expressed a possible safety concern regarding Harrison continuing to work in a yard, spotting trailers. This concern had been relayed to her from Edwards. After Wilcox-McCurtain instructed Klinger to inform Harrison that his employment was terminated, Klinger called Harrison to tell him of the decision. On the next scheduled work day, Harrison appeared at the Americold gate and was denied access. Lazer Spot issued an employment termination notice to Harrison reflecting that Harrison had resigned. Upon receiving this notice, Harrison called Wilcox-McCurtain, insisted that he did not quit and asked to be reinstated.

On July 18, 2013, Harrison filed a Complaint with the PHRC. A public hearing was held before a permanent hearing examiner (Hearing Examiner) on June 28, 29 and 30, 2016. On February 21, 2017, the Hearing Examiner concluded that Harrison had proven that Lazer Spot discriminatorily denied an accommodation of his disability, PTSD, and terminated his employment because of his disability in violation of Section 5(a) of the Pennsylvania Human Relations Act (PHRA).[5] On March 27, 2017, the PHRC issued an Opinion and Final Order adopting the Hearing Examiner's Findings of Fact, Conclusions of Law, and Opinion. PHRC directed Lazer Spot, *inter alia*, to: cease and desist denying reasonable accommodations to employees with disabilities and terminating employees' employment because of their disabilities; pay Harrison $104,364.23 plus additional interest of 6% per annum from February 7, 2013 until payment is made; reimburse Harrison $10,880.00 for costs

---

[5] Act of October 27, 1955, P.L. 744, *as amended,* 43 P.S. § 955(a).

incurred pursuing his claim; and offer to reinstate Harrison as a yard jockey. Lazer Spot appealed to this Court.[6]

Lazer Spot first argues that Harrison does not have a non-job-related handicap or disability because he is not substantially limited in the major life activities of sleeping and working. The PHRC and Harrison[7] (collectively, Respondents) rejoin that substantial evidence supports the PHRC's conclusion that Harrison was substantially limited in the major life activities of sleeping and working under the Americans with Disabilities Act (ADA)[8] Amendments Act of 2008 (ADAAA).[9]

Initially, Section 5 of the PHRA states, in relevant part:

It shall be an unlawful discriminatory practice, unless based upon a bona fide occupational qualification . . . :

(a) For any employer because of the . . . **non-job**[-] **related handicap** . . . of any individual . . . to discharge from employment such individual . . . or to otherwise discriminate against such individual . . . with respect to compensation, hire, tenure, terms, conditions or privileges of employment . . . , if the individual . . . is the best able and most competent to perform the services required.

43 P.S. § 955 (emphasis added). Further, Section 4(p.1) of the PHRA provides:

---

[6] "Our scope of review is limited to determining whether the PHRC violated constitutional rights, made findings of fact which are not supported by substantial evidence, or committed an error of law." *Pa. Bd. of Prob. & Parole v. Pa. Human Relations Comm'n,* 66 A.3d 390, 395 n.9 (Pa. Cmwlth. 2013).

[7] By July 5, 2017 order, this Court granted Harrison's application to intervene.

[8] 42 U.S.C. §§ 12101-12213.

[9] On September 25, 2008, Congress enacted the ADAAA, effective January 1, 2009, in order to reinstate a broad scope of protection under the ADA. Significantly, the ADAAA amended the definition of "disability," making it easier for an individual to establish that he or she has a disability under the ADA. "Although . . . the ADAA[A] [ ] made it easier to prove a disability, [Harrison] must still show a substantial limitation. *See* [Section 4(a)(1)-(2) of the ADA,] 42 U.S.C. § 12102(1)-(2)." *Cunningham v. Nordisk,* 615 Fed. App'x 97, 100 (3d Cir. 2015).

6

> The term **'handicap or disability,'** with respect to a person, means:
>
> (1) a physical or mental impairment **which substantially limits one or more of such person's major life activities**;
>
> (2) a record of having such an impairment; or
>
> (3) **being regarded as having such an impairment,** but such term does not include current, illegal use of or addiction to a controlled substance, as defined in section 102 of the Controlled Substances Act (Public Law 91-513, 21 U.S.C. § 802).

43 P.S. § 954(p.1) (text emphasis added). Section 44.4(ii)(B) of the PHRC's Regulations defines "'[m]ajor life activities' [as] functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and **working**." 16 Pa. Code § 44.4(ii)(B) (emphasis added).

> In order to make out a prima facie case of disability discrimination under the **ADA and PHRA**, a plaintiff must establish that s/he (1) has a '**disability**,' (2) is a 'qualified individual,' and (3) has suffered an adverse employment action because of that disability. *Gaul v. Lucent Techs. Inc.,* 134 F.3d 576, 580 (3d Cir. 1998).

*Buskirk v. Appollo Metals,* 307 F.3d 160, 166 (3rd Circ. 2002) (emphasis added; footnote omitted). Substantially identical to the PHRA, Section 4(a)(1) of the ADA defines "disability" as "(A) a physical or mental impairment that **substantially limits one or more major life activities** . . . ; (B) a record of such an impairment; or (C) being regarded as having such an impairment (as described in paragraph (3))." 42 U.S.C. § 12102(1) (emphasis added). "For purposes of paragraph (1), major life activities include, but are not limited to . . . **sleeping** . . . **and working**." 42 U.S.C. § 12102(2)(A) (emphasis added).

Lazer Spot maintains that the ADAAA does not apply to the instant matter because the Pennsylvania General Assembly did not amend the PHRA to match the ADAAA's changes. Although this Court is not bound in its interpretation

7

of the PHRA by federal interpretations of parallel provisions, Pennsylvania courts generally interpret the PHRA in accordance with its federal counterparts. *Kelly v. Drexel Univ.,* 94 F.3d 102, 105 (3d Cir. 1996); *see also Toth v. Slippery Rock Univ. of Pa.* (Pa. Cmwlth. No. 351 C.D. 2010, filed October 20, 2010);[10] *Stultz v. Reese Bros., Inc.,* 835 A.2d 754, 759 (Pa. Super. 2003) ("Moreover, the PHRA definition of 'disability' is substantially identical to the definition of 'disability' under the ADA."); *Imler v. Hollidaysburg Am. Legion Ambulance Serv.,* 731 A.2d 169, 173 (Pa. Super. 1999) ("The PHRA and ADA are interpreted in a co-extensive manner. This is because the PHRA and ADA deal with similar subject matter and are grounded on similar legislative goals."). Indeed, Section 44.2(b) of the PHRC's Regulations expressly provides: "This chapter will be construed consistently with other relevant [f]ederal and [s]tate laws and regulations except where the construction would operate in derogation of the purposes of the [PHRA] and this chapter." 16 Pa. Code § 44.2(b).

Having determined that "disability" is substantially the same under the PHRA and the ADA, this Court now examines whether substantial evidence supports the PHRC's conclusion that Harrison suffered a non-job-related handicap or disability under both the PHRA and the ADA. Specifically, we address whether Harrison's PTSD substantially limits his major life activities of sleeping and working. "Substantial evidence is such relevant evidence that a reasonable mind might accept as adequate to support the conclusion reached." *New Corey Creek Apartments, Inc. v. Pa. Human Relations Comm'n,* 865 A.2d 277, 280 (Pa. Cmwlth. 2004).

First, Section 1630.2(j)(3)(iii) of the Equal Employment Opportunity Commission's (EEOC) Regulations expressly deems "[PTSD] . . . [as] substantially

---

[10] We acknowledge that this Court's unreported memorandum opinions may be cited "for [their] persuasive value, but not as a binding precedent." Section 414(a) of the Commonwealth Court's Internal Operating Procedures, 210 Pa. Code § 69.414(a).

limit[ing] brain function, [and] . . . [possibly] substantially limit[ing] additional major life activities not explicitly listed above." 29 C.F.R. § 1630.2(j)(3)(iii).[11] Here, the parties do not dispute that Harrison has PTSD. With respect to whether his PTSD substantially limits his sleeping, a review of the record reveals that Harrison presented extensive evidence concerning the effect of his PTSD on his sleeping. However, Harrison did not offer any evidence to prove that Lazer Spot was aware of said limitations, nor do Respondents now argue that Lazer Spot had any knowledge of the same.

> For purposes of proving ADA discrimination, **it is important to distinguish between an employer's knowledge of an employee's disability versus an employer's knowledge of any limitations experienced by the employee as a result of that disability**. This distinction is important because **the ADA requires employers to reasonably accommodate limitations, not disabilities**. 'The determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual.' 29 C.F.R. [§] 1630.2(j), App. (1995); [Section 5(a)(a)(5)(A) of the ADA,] 42 U.S.C. § 12112(a)(5)(A) ('[T]he term 'discriminate' includes . . . not making reasonable accommodations to the known physical or mental *limitations* of an otherwise qualified individual with a disability. . . .') (emphasis added); 29 C.F.R. [§] 1630.9, App. (1995) ('Employers are obligated to make reasonable accommodations only to the physical or mental *limitations* resulting from the disability that is known to the employer.') (emphasis added).

*Taylor v. Principal Fin. Grp., Inc.,* 93 F.3d 155, 164 (5th Cir. 1996); *see also Becknauld v. Dep't of Agriculture* (Pa. Cmwlth. No. 678 C.D. 2016, filed January 4, 2017); *Toth*. Thus, despite whether substantial evidence supports the conclusion that Harrison's PTSD substantially limited his sleeping, the fact that Lazer Spot was not

---

[11] There is no similar provision in the PHRC's Regulations.

9

aware of that limitation precludes a finding of discrimination based thereon. Accordingly, the PHRC erred in concluding that Harrison was disabled on account of his PTSD substantially limiting his sleep.[12]

Next, this Court addresses whether Harrison's PTSD substantially limited his ability to work. Lazer Spot argues that Harrison's PTSD only prevented him from performing one specific job and, thus, did not qualify as a non-job-related handicap or disability. Respondents rejoin that this issue was addressed by the United States Appeals Court in *Best v. Shell Oil Co.,* 107 F.3d 544 (7th Cir. 1997).

In *Best,* the employer argued, as Lazer Spot does,

> that the evidence shows only that Best could not drive Peterbilt trucks with a particular clutch configuration, but that he was able easily to work as a truck driver in other kinds of vehicles. This compels a finding . . . that Best's disability did not interfere with a major life activity, and thus that he was not a 'qualified individual with a disability' within the meaning of the ADA.

*Id.* at 548. However, the *Best* Court concluded that the allegations (*i.e.*, Best's knee injury made it painful for him to drive employer's trucks with a clutch, a doctor recommended that Best consider alternative work duties on a full-time basis for the future, and during a Driver Performance Evaluation Best was told that he was not safe to drive and should not be driving) were sufficient that a trier of fact could find that Best's "injury [impacted] the major life activity of working." *Id.*

Here, the parties do not dispute that Harrison has PTSD and because of that condition he informed Lazer Spot he could not drive an 18-wheeled tractor-trailer

---

[12] Although the ADA did not set forth a list of major life activities prior to the ADAAA, the EEOC's Regulations under the ADA defined major life activities to mean functions which included, *inter alia*, working but not sleeping. Similarly, the PHRA's Regulations defined major life activities as including, *inter alia,* working but not sleeping. *See* 16 Pa. Code § 44.4. Given this Court's disposition of this issue, the fact that sleeping is not included as a major life activity in the PHRA's Regulations is of no moment in the instant case.

on a public roadway. *See* Reproduced Record (R.R.) at 135a-136a. Neil S. Kaye, M.D. (Dr. Kaye), who is board certified in psychiatry, forensic psychiatry and geriatric psychiatry, testified that "Harrison clearly has [PTSD] directly related to his war experience." R.R. at 353a. He further confirmed that "Harrison's PTSD is triggered when he is in the kind of cab driving in a large vehicle like an 18-wheeler on an open road, because that reminds him of his experiences in combat." R.R. at 363a. Although Lazer Spot accommodated Harrison's disability in 2012, *see* R.R. at 136a-137a, in 2013, he was told if he did not drive an 18-wheeled tractor-trailer on a public roadway, he would be deemed to have resigned from his employment. *See* R.R. at 698a. Importantly, upon discussing Harrison's PTSD, as in *Best,* Wilcox-McCurtain expressed safety concerns about Harrison operating **any vehicles** within the Americold yard. *See* R.R. at 548a. Lazer Spot's concern, and final reason for Harrison's employment termination, that Harrison's PTSD makes him unsafe to drive **any vehicle**, conflicts with its argument that his ability to work is not substantially limited because his PTSD only effects his driving of 18-wheelers.

> The Hearing Officer opined:

> In this case, the symptoms of Harrison's impairment are relatively unique as they relate to leaving him unable to drive an 18[-]wheeler over the road without attendant potential harm. The fundamental idea that Harrison's PTSD could result in harm to either himself or others on the road clearly disqualifies Harrison from a broad spectrum of trucking industry jobs. Harrison's real work opportunities are substantially limited and his occupational base is largely reduced because of his PTSD symptoms. Accordingly, Harrison is substantially impaired in the major life activity of working.

Hearing Officer Op. at 39. We discern no error in this analysis. Accordingly, pursuant to both the PHRA and the PHRC's Regulations, and the ADA and the

11

EEOC's Regulations, because Harrison's PTSD substantially limits his work, we hold that Harrison has a non-job-related handicap or disability.

Notwithstanding whether Harrison's PTSD substantially limits his ability to work, substantial evidence supports the conclusion that Lazer Spot regarded Harrison as having an impairment.[13]  Section 44.4(ii) (D) of the PHRC's Regulations defines

> '[i]s regarded as having an impairment' [as] ha[ving] a physical or mental impairment that does not substantially limit major life activities but that is treated by an employer or owner, operator or provider of a public accommodation as constituting a limitation; has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward the impairment; or has none of the impairments defined in subparagraph (i)(A) but is treated by an employer or owner, operator or provider of a public accommodation as having an impairment.

16 Pa. Code § 44.4(ii)(D).  Similarly, Section 4a(3)(A) of the ADA provides:

> An individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.

42 U.S.C. § 12102(3)(A).

> An individual rejected from a job because of the 'myths, fears and stereotypes' associated with disabilities would be covered under this part of the definition of disability,

---

[13] The PHRC adopted the Hearing Examiner's Findings of Fact, Conclusions of Law, and Opinion.  *See* PHRC Final order.  Although the PHRC did not address whether Harrison was unlawfully discriminated against on the basis of being regarded as having an impairment, "where grounds for affirmance exist," this Court "may affirm on other grounds." *FP Willow Ridge Assocs., L.P. v. Allen Twp.,* 166 A.3d 487, 496 n.11 (Pa. Cmwlth. 2017) (quoting *Kutnyak v. Dep't of Corr.*, 748 A.2d 1275, 1279 n.9 (Pa. Cmwlth. 2000)).

whether or not the employer's or other covered entity's perception were shared by others in the field and whether or not the individual's actual physical or mental condition would be considered a disability under the first or second part of this definition. As the legislative history notes, **sociologists have identified common attitudinal barriers that frequently result in employers excluding individuals with disabilities**. **These include concerns regarding** productivity, **safety**, insurance, liability, attendance, cost of accommodation and accessibility, workers' compensation costs, and acceptance by coworkers and customers.

*Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1132 (10th Cir. 2003) (emphasis added) (quoting Section 1630.2(*l*) of the EEOC's Regulations, 29 C.F.R. §1630.2(*l*)).[14]

Here, Edwards testified:

Q. And when [] Harrison expressed to you that he [could not drive an 18-wheeler on the road] because of PTSD, that concerned you, didn't it?

A. Yes, it did.

Q. And it concerned you specifically because it raised a safety concern; isn't that correct?

A. That's correct.

Q. In response to that concern, you didn't contact [] Harrison's doctor at any point, did you?

A. No, I did not.

Q. And you didn't contact Lazer Spot's doctor at that point to discuss your concern, did you?

A. No, I did not.

Q. Did you do any [i]nternet research on PTSD and driving a spotter truck?

A. No, I did not.

---

[14] As discussed above, because of the substantial similarities between the PHRA and the ADA, this Court looks to federal law to guide its interpretation. *See Kelly*; *Toth*; *Imler*.

13

Q. Did you review the safety record of [] Harrison to determine if he was having issues with safely performing his job?

A. Yes, I did.

Q. You did? And what did you find?

A. Nothing. I mean, he was a safe driver when he was driving.

Q. So he had been working at Americold or at Lazer Spot for roughly a year and a half, and there were no safety concerns on his record?

A. No, there was not.

Q. Did you review any studies pertaining to PTSD and how that might affect drivers in the yard?

A. No, I did not.

Q. So the concern that you had regarding [] Harrison's ability to do his job safely, that was just an assumption on your part; correct?

A. No, it's not. In explaining, [] Harrison said that he couldn't drive over the road because he may have an episode on the road. Then my concern became he may have an episode on the yard as well. That was my safety concern.

Q. But you were just speculating that he would have problems in the yard; right?

A. It only came from [] Harrison's conversation that he couldn't drive over the road.

Q. But he didn't tell you that he had concerns, safety concerns about driving in the yard, did he?

A. No, he did not.

Q. And you discussed these concerns with your human resources department; correct?

A. Yes, and general counsel.

Q. And you didn't suggest that your company obtain more information about [] Harrison's condition?

A. No, I did not.

Q. **And after you conveyed your concerns to the decision makers at Lazer Spot, Lazer Spot terminated [] Harrison's employment; isn't that correct**?

A. **That's correct**.

Q. And you were involved in that decision?

A. It was a joint decision.

Q. Do you recall exactly what [] Harrison told you about his concerns driving over the road?

A. Not the conversation. I can't recall every word and detail.

Q. Do you recall him telling you that his concerns were specific to driving in a day cab or an 18[-]wheeler?

A. He just said 18[-]wheeler over the road.

R.R. at 535a-537a (emphasis added). Thus, upon hearing that Harrison's PTSD affected his driving an 18-wheeler on the road, Lazer Spot treated him as if his PTSD limited him from any driving whatsoever. Consequently, Lazer Spot regarded Harrison as having an impairment and unlawfully discriminated against him on that basis in terminating his employment.

Lazer Spot further argues that Harrison did not need an accommodation because he was capable of driving an 18-wheeled tractor-trailer on the public road. Specifically, Lazer Spot contends that because: (1) Harrison never reported his PTSD to his previous employer KBR Transportation (KBR);[15] (2) Harrison passed a 2010 DOT medical examination; (3) Harrison never relinquished his Class A CDL; (4)

---

[15] KBR is a civilian contractor that provided services to the United States government, including truck driving, in Iraq. Harrison worked in a combat zone in Iraq during his employment with KBR. *See* R.R. at 87a.

Harrison admitted that Lazer Spot required all of its drivers to have a Class A CDL and a DOT medical card; (5) in 2012, Harrison obtained a two-year DOT medical card; and (6) in 2013, Harrison submitted to another DOT medical exam, he was capable of driving an 18-wheeler without accommodation. We disagree.

First, it was Harrison's work at KBR that triggered his PTSD symptoms and made him realize he could no longer drive 18-wheeled tractor-trailers over public roadways. *See* R.R. at 90a-91a. Further, his PTSD was not diagnosed until after he had left KBR. *See* R.R. at 110a. That Lazer Spot requires a Class A CDL and a DOT medical card is irrelevant to whether driving an 18-wheeler on a public roadway is an essential job function. Likewise, Harrison's mere possession of those items does not signify that he can drive an 18-wheeled tractor-trailer on a public roadway. This fact is especially true here, where Lazer Spot required Harrison to obtain said documents, yet Harrison only applied for and was offered a yard jockey position, which he successfully worked from 2011 until 2013.

> Within the context of employment discrimination involving persons with a disability, it is somewhat intuitive that if a person wants and/or needs a reasonable accommodation to successfully perform a job, one must first have a disability, one must then inform the employer of the existence of the disability, and to the extent that one wants/needs a reasonable accommodation related to the disability, one should request a reasonable accommodation. Thereafter, with the assistance of the employer, one must decide what would be a reasonable accommodation under the circumstances. The ADA is quite explicit in this regard.
>
> As used in subsection (a) of this section, the term 'discriminate against a qualified individual on the basis of disability' includes—
>
> . . . . .
>
> (5)(A) not making reasonable accommodations to the *known* physical or mental limitations of an otherwise qualified individual . . . who is an . . .

16

> employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity[.]
>
> [Section 5(b)(b) of the ADA,] 42 U.S.C. § 12112(b) (emphasis added); *see also* ADA Regulations, 29 C.F.R. [§] 1630.9.

*Allen v. State Civil Comm'n,* 992 A.2d 924, 931-32 (Pa. Cmwlth. 2010).

> These rules are consistent with the statute which says that the employer must make reasonable accommodations to an employee's '*known*' disability. [Section 5(a)(b)(5)(A) of the ADA,] 42 U.S.C. § 12112(b)(5)(A). What matters under the ADA are not formalisms about the manner of the request [for reasonable accommodation], but whether the employee . . . *provides the employer with enough information that,* under the circumstances, the employer *can be fairly said to know of both the disability and desire for an accommodation.*

*Allen,* 992 A.2d at 932 (quoting *Taylor v. Phoenixville Sch. Dist.* 184 F.3d 296, 313 (3d Cir. 1999)).

Here, Lazer Spot argues Harrison does not need an accommodation because Harrison's PTSD does not preclude him from working as a truck driver generally and driving an 18-wheeler specifically. However, when faced with the option of giving Harrison a reasonable accommodation, i.e., permitting him to cross-train at a site with a gated yard and no public roads, *see* R.R. at 534, which Lazer Spot had provided the first time it was made aware of Harrison's PTSD, *see* R.R. at 532a, suddenly Lazer Spot determined upon Harrison's refusal to drive an 18-wheeler on a public road, that Harrison was not safe to drive any vehicle. *See* R.R. at 535a. This conclusion was made notwithstanding that: Lazer Spot was aware Harrison had PTSD; Harrison had requested and received a reasonable accommodation therefor, *see* R.R. at 532a; after reviewing Harrison's safety records, it was determined "he was a safe driver when driving[,]" R.R. at 535a; and there was no reason Harrison

17

could not continue to work specifically at Americold. *See* R.R. at 534a. Accordingly, this Court holds that Lazer Spot, by not providing Harrison a reasonable accommodation for his PTSD, or demonstrating that a reasonable accommodation would impose an undue hardship on Lazer Spot's operations, has unlawfully discriminated against Harrison. *See Allen.*

Lazer Spot next asserts that participation in cross-training that involved driving an 18-wheeled tractor-trailer over public roads or being subject to temporary assignments to perform shuttle work are essential functions of Lazer Spot's driver position. We disagree.

The PHRA and the PHRC's Regulations do not define essential functions. Pursuant to Section 1630.2(n)(1) of the EEOC's Regulations, "[t]he term essential functions means the fundamental job duties of **the employment position the individual with a disability holds** or desires. The term 'essential functions' does not include the marginal functions of the position." 29 C.F.R. § 1630.2(n)(1) (emphasis added). Further, Section 1630.2(n)(2) of the EEOC's Regulations provides:

> A job function may be considered essential for any of several reasons, including but not limited to the following:
>
> (i) The function may be essential because the reason the position exists is to perform that function;
>
> (ii) The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or
>
> (iii) The function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function.

29 C.F.R. § 1630.2(n)(2).

Here, the record evidence revealed that Harrison's yard jockey job did not require driving an 18-wheeled tractor-trailer over public roads or being subject to temporary shuttle work assignments. Moreover, Lazer Spot did not present any evidence that a yard jockey position exists to perform cross-training that involves driving an 18-wheeled tractor-trailer over public roads or shuttle work. Indeed, Lazer Spot's Employee Handbook provides: "Where *possible*, we *attempt* to cross-train our employees so that they can perform as many tasks as possible." R.R. at 811a (emphasis added). Clearly, this language is not mandatory requiring cross-training. Nor did Lazer Spot establish that there were a limited number of employees available to perform cross-training involving driving an 18-wheeled tractor-trailer over public roads or shuttle work, or that Harrison was hired because of his expertise in cross-training involving driving an 18-wheeler over public roads or shuttle work. To the contrary, other than providing a CDL, Harrison was never asked about or directed to drive an 18-wheeled tractor–trailer and/or on a public road. *See* R.R. at 100a-102a. He was shown a jockey truck, tested on a jockey truck (without driving on a public road), and thereafter solely worked as a yard jockey. *See* R.R. at 102a-103a, 105a-106a.

Finally, Section 1630.2(n)(3) of the EEOC's Regulations sets forth:

Evidence of whether a particular function is essential includes, but is not limited to:

(i) The employer's judgment as to which functions are essential;

(ii) **Written job descriptions prepared before advertising or interviewing applicants for the job**;

(iii) **The amount of time spent on the job performing the function**;

(iv) **The consequences of not requiring the incumbent to perform the function**;

19

(v) The terms of a collective bargaining agreement;

(vi) The work experience of past incumbents in the job; and/or

(vii) The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3) (emphasis added). Here, Harrison expressly testified that Lazer Spot's advertisement specified "a vacancy for a yard jockey," R.R. at 97a-98a, that he applied for the "[y]ard jockey" position, R.R. at 98a-99a, *see also* R.R. at 992a (Harrison's Employment Application), and during his job interview Klinger specifically offered him the "job as a yard jockey." R.R. at 100a, 102a. Harrison's first assignment was to operate a jockey truck at Reckitt Benckiser. *See* R.R. at 103a. On February 6, 2012, Harrison was transferred to Americold. According to the "Change of Position or Relocation" form, the transfer was a "[r]elocation" not a change of position. R.R. at 869a. Harrison worked at Americold until his discharge on February 7, 2013. Pursuant to the parties' Joint Stipulations, Exhibits, and Witness List:

> 7. The Americold property is completely enclosed within a fence surrounding the property[.]

> 8. Americold is a property not considered public roadway or a highway open to public travel for CDL purposes.

> 9. In connection with his assignment to work in the yard at Americold, [Harrison] did not operate a commercial motor vehicle on a public roadway or a highway open to public travel.

R.R. at 791a. Thus, Harrison was not required at any time during his employment with Lazer Spot to drive an 18-wheeler on a public roadway or perform shuttle work. Further, none of Lazer Spot's witnesses testified as to any consequences Lazer Spot would face if Harrison did not cross-train on 18-wheeled tractor-trailers over public roads or perform shuttle work. Rather, Edwards confirmed that there was no reason

that "Harrison could not have continued to work specifically at Americold[.]" R.R. at 534a.

Finally, the United States Appeals Court in *Simon v. St. Louis County, Missouri*, 656 F.2d 316 (8th Cir. 1981) held, regarding essential functions: "If not uniformly required, they should not be considered actual requirements for all positions." *Id.* at 321. In the instant case, the Hearing Officer explained:

> Here, the simple fact is that Lazer Spot had employees who were exempt from the more rigorous cross-training program. Lazer Spot had several customer sites that were generally described as 'remote isolated' sites. Employees at those sites would never be required to drive 18[-]wheelers over the road. . . . Lazer Spot cannot say that driving an 18[-]wheeler over public roads is mandatory for one employee and not others.
>
> Considering the totality of the circumstances regarding spotting and shuttle duties actually performed by Lazer Spot employees, neither the requirement of cross-training that would include driving an 18[-]wheeler over public roads nor being potentially assigned duties of driving an 18[-]wheeler over public roads are deemed essential functions of the job Harrison held. Those functions are not fundamental but deemed marginal.

Hearing Officer Op. at 52-53. We discern no error in the Hearing Officer's reasoning. Accordingly, under these circumstances, we hold that participation in cross-training that involved driving an 18-wheeled tractor-trailer over public roads or being subject to temporary shuttle work assignments are not essential functions of Lazer Spot's yard jockey position.

Lastly, Lazer Spot contends that Harrison did not mitigate his damages during the time period he attended YTI and did not look for work. Lazer Spot cites *Keller v. Connaught, Inc.* (E.D. Pa. No. 96-177, filed February 10, 1997)[16] for its

---

[16] This Court recognizes that *Keller* is a non-reported, non-precedential opinion and is distinguishable from the case *sub judice* for the reasons stated by the Hearing Examiner. *See*

holding: "The mitigation of damages requirement has been sharpened in the education-after-termination cases and obligates the plaintiff, when in school, to remain ready, willing and available to enter the work force." *Id.,* slip op. at 3. In support of its position, Respondents rely upon *Equal Employment Opportunity Commission v. Local 638,* 674 F. Supp. 91 (S.D.N.Y. 1987), which held that a court must consider "whether an individual's furtherance of his education is inconsistent with his responsibility 'to use reasonable diligence in finding other suitable employment.'" *Id.* at 104 (quoting *Ford Motor Co. v. Equal Emp't Opportunity Comm'n*, 458 U.S. 219, 231 (1982)).

> The *Local 638* Court explained:

> An individual who abandons his willingness to search for and return to work and opts to attend school instead generally does not meet his duty to mitigate damages during the time he is in school. On the other hand, one who chooses to attend school only when diligent efforts to find work prove fruitless, or who continues to search for work even while enrolled in school, does meet the duty.

*Id.* at 104 (citations omitted).

> With respect to his YTI enrollment, Harrison testified:

> Q. What did you do after you left Kloeckner [Metals]?[17] Did you continue to look for work?

> A. Yes, sir.

> Q. You didn't find anything within your skill set; is that right?

> A. No, sir.

> Q. So did you enroll in school?

> A. Yes, sir, I went to YTI . . . .

Hearing Officer Op. at 61. However, because *Keller* is the basis for Lazer Spot's argument, it is included for that purpose only.

[17] Harrison worked at Kloeckner Metals after Lazer Spot discharged him. *See* R.R. at 148a.

Q. What was your purpose in going back to school?

A. I figured that since ---. Yeah, I had --- the [Veteran's Administration] was offering me college, basically, free college, that I ---.

Q. A trade, essentially?

A. Yes, sir, that, you know, I wanted to start up - start something new, start something fresh. And I was looking through different things, and I saw that they have electrician. So I figured, well, why not?

**Because that way, I'll be able to rewire my house, put a fan or light in and I won't have to pay somebody to do that. I'd rather be able to do that myself and get it done**.

. . . .

Q. Were there other reasons why you enrolled at YTI?

A. Yes, sir, it's to start a new life, if you want to call it that. You know, start from the ground up, I guess.

Q. **And was that a full**[-]**time enrollment?**

A. **Yes, sir, a full five days a week.**

Q. You weren't working during the time you were at YTI; is that right?

A. No, sir.

R.R. at 150a-152a (emphasis added). Harrison further related that he did not have time to look for employment while he matriculated at YTI because his school enrollment was full-time. *See* R.R. at 204a. He explained that after he finished the program, he looked for work as an electrician but discovered that he would first have to work as a low-paid apprentice, which he could not afford. *See* R.R. at 152a.

Based on the above testimony, this Court cannot conclude that Harrison mitigated his damages while enrolled in school full-time. Considering Harrison admitted that he was not looking for work while he was enrolled in school and that he

23

chose the electrician trade for personal reasons, without knowing or exploring the employment opportunities or lack thereof that would follow, this Court holds that Harrison's "furtherance of his education [wa]s inconsistent with his responsibility 'to use reasonable diligence in finding other suitable employment.'" *Local 638,* 674 F. Supp. at 104 (quoting *Ford Motor Co.*, 458 U.S. at 231).

For all of the above reasons, the PHRC's March 27, 2017 Final Order is reversed with respect to Harrison's mitigation of damages while enrolled in YTI, and affirmed in all other respects.

_____
ANNE E. COVEY, Judge

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Lazer Spot, Inc.,                            :
                     Petitioner     :
           v.                          :
                                             :
Pennsylvania Human Relations         :
Commission,                                  :     No. 459 C.D. 2017
                  Respondent     :

## O R D E R

AND NOW, this 2nd day of February, 2018, the Pennsylvania Human Relations Commission's March 27, 2017 Final Order is reversed with respect to Matthew A. Harrison's mitigation of damages while enrolled in York Technical Institute, and affirmed in all other respects.

_____
ANNE E. COVEY, Judge